UNITED STEELWORKERS OF AMERICA (AFL–CIO), LOCAL UNION NO. 4264, Appellant,

v.

NEW PARK MINING COMPANY, Appellee.

No. 6106.

United States Court of Appeals
Tenth Circuit.

Nov. 12, 1959.

Rehearing Denied Nov. 30, 1959.

A. Wally Sandack, Salt Lake City, Utah (Algerdas N. Cheleden, Los Angeles, Cal., and Jerry D. Anker, Washington, D. C., were with him on brief), for appellant.

Calvin A. Behle, Salt Lake City, Utah (C. C. Parsons, Elliott W. Evans, A. D. Moffat and Keith E. Taylor, Salt Lake City, Utah, were with him on brief), for appellee.

Before MURRAH, Chief Judge, and HUXMAN and PICKETT, Circuit Judges.

MURRAH, Chief Judge.

In this suit by a Labor Union under Section 301 of the Labor Management Relations Act of 1947, 61 Stat. 156, 29 U.S.C.A. § 185, the Union alleged that it was a labor union within the meaning of such Section; that the defendant corporation was a mining company with whom the Union had entered into a collective bargaining agreement to run until June 30, 1958, providing for specific grievance procedure, and also that "before resorting to economic force the Company and the Union shall have completed the procedure provided for herein, or shall further make an effort to agree to dispose of the difference or grievance by means of arbitration." It was then alleged that while the collective bargaining agreement was in effect, the Company discharged its 170 employees, and for the purpose of avoiding its obligations under the bargaining contract, and in violation thereof, entered into a leasing arrangement with some of its employees for the purpose of continuing its mining operations. It was alleged that the Union had protested the discharge of the employees and the entering into the so-called leasing contracts on the grounds that it violated the collective bargaining agreement; that the Union had sought, through prescribed procedure, to arbitrate the grievance; and that the Company had refused to arbitrate. The prayer was, first, for a declaratory judgment requiring the Company to arbitrate the grievances and to appoint an impartial arbitrator for that purpose; and second, a judgment declaring the so-called leasing agreements invalid and subordinate to the prior collective bargaining agreement. In a second count of the complaint, cast under Rule 17(a) F.R.Civ.P. 28 U.S.C.A., the Union sought to recover accrued back wages and vacation pay for the 170 member-employees

as provided for in the bargaining contract.

Jurisdiction of the second count was based upon diversity of citizenship and requisite amount in controversy. None of the claims of the individual employees was sufficient in amount to confer federal jurisdiction, but it was alleged that the Union was a party in whose name a contract had been made with the defendant-corporation for the benefit of the 170 members, residents of the State of Utah, and that the defendant was a citizen of the State of Nevada. The prayer was for a declaratory judgment in favor of the Union for the benefit of its 170 members for the amount of the back wages and vacation pay.

The trial court refused to compel arbitration on the grounds that an agreement "to make an effort to agree" to arbitrate did not amount to an enforceable agreement to do so. It refused to invalidate the so-called leasing agreements or to subordinate them to the bargaining agreement, apparently on the grounds that they were made in pursuance of the management's prerogative to hire, discharge, manage and direct the working forces; and apparently for the further reason that the asserted grievance was at most an unfair labor practice within the exclusive jurisdiction of the National Labor Relations Board. It denied the claim for back wages and vacation pay on the grounds that the court was without jurisdiction to entertain the action by the Union based on the individual rights of the Union members, and that Rule 17 (a) F.R.Civ.P. did not operate to authorize the aggregation of the individual claims to confer federal jurisdiction. See the court's opinion, D.C., 169 F. Supp. 107.

We readily agree with the trial court that there was no agreement to arbitrate, and the court can only compel arbitration when the parties have agreed to do so. See Local 1912 International Association of Machinists v. United States Potash Co., 10 Cir., 270 F.2d 496. So too, we agree that the trial court lacked jurisdiction of the claims for accrued back wages and vacation pay. The wages and vacation pay were undoubtedly negotiated by the Union on behalf of its members, and were a part of the subject matter of the bargaining contract. And, Section 301(a) provides that "Suits for violation of contracts between an employer and a labor organization representing employees * * * may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." And, Section 301(b) provides in material part that " * * * Any such labor organization may sue or be sued as an entity and in behalf of the employees whom it represents in the courts of the United States. * * *." But federal court jurisdiction thus conferred has been restricted to contract violations of "peculiar concern" to the Union as an organization, such as agreements to arbitrate wages, hours and conditions of employment, United Steelworkers of America v. Pullman-Standard Car Mfg. Co., 3 Cir., 241 F.2d 547; and to the enforcement of collective awards made pursuant to arbitration of grievances arising out of the labor contract. A. L. Kornman Co. v. Amalgamated Clothing Workers, 6 Cir., 264 F.2d 733; Item Co. v. New Orleans Newspaper Guild, 5 Cir., 256 F.2d 855; Textile Workers Union of America v. Cone Mills Corp., 4 Cir., 268 F.2d 920; Enterprise Wheel & Car Corp. v. United Steelworkers of America, 4 Cir., 269 F.2d 327. Federal jurisdiction does not extend to the enforcement of rights which are "uniquely personal" to the employees, such as back wages and vacation pay. See Association of Westinghouse Salaried Employees v. Westinghouse Electric Corp., 348 U.S. 437, 75 S.Ct. 489, 99 L.Ed. 510; United Steelworkers of America v. Pullman-Standard Car Mfg. Co., supra; Local Lodge 2040 International Association of Machinists v. Servel, Inc., 7 Cir., 268 F.2d 692.

■ While Rule 17(a), F.R.Civ.P. authorizes the Union to bring suit as the party in whose name the contract was made for the benefit of the employees, it does not operate to confer jurisdiction which does not otherwise exist. 3 Moore Federal Practice, 2d Ed., p. 1311, § 1703. As we have seen, the interest of the Union in the lawsuit is as the bargaining agent of the individual employees. The claimed benefits ran to the employees, not to the Union, and they could not aggregate them for purposes of federal jurisdiction.

■ But apart from the claimed back wages and vacation pay, the Union has asserted an interest in the collective bargaining contract which is of peculiar concern to it as a labor organization, i. e. the discharge of all employee-Union members and the leasing of its mining operations to some of its employees for the purpose of avoiding its obligations under the labor contract and in direct violation thereof. This claim goes to the very heart of a bargaining contract "between an employer and a labor organization representing employees", of which the court undoubtedly has jurisdiction.

This brings us directly to the question whether the shifting of the mining operations under an employer-employee relationship to one of the lessor-lessee as characterized by the so-called leasing agreements, was in violation of the collective bargaining agreement. No one can doubt the inherent right of the employer to quit business without prejudice to the bargaining contract. See Local Lodge 2040 International Association of Machinists v. Servel, Inc., supra; Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972. And, courts have affirmed the right, whether inherent or expressed, to subcontract work usually performed by employees, without violating its bargaining contract, in the absence of an expressed agreement not to do so. United Steelworkers v. Warrior & Gulf Navigation Co., 5 Cir., 269 F.2d 633; Amalgamated Association of St. Elec. Ry. and Motor Coach Emp. of America, Division 1326 v. Greyhound Corp., 231 F.2d 585, 57 A.L.R.2d 1394; Annotation 57 A.L.R. 2d 1399.

■ And so, there is good authority for saying that whether the Company actually quit business or merely decided to subcontract its work by a leasing arrangement, it had the absolute right to do so, even though its action brought the contract to an end before its expiration date. But we think this construction of a collective bargaining contract ignores the covenant of good faith and fair dealings which must inhere in every collective bargaining contract if it is to serve its institutional purposes.

■ In most instances, where the parties have committed the interpretation and application of their bargaining contract to the arbitral process, the arbitrators have interpreted the contracts to exclude subcontracting of work usually performed by employees on the premises in the absence of an agreement to that effect. And, contracts have been so interpreted in the face of restrictive management function provisions. See cases collected in Local 1912 International Association of Machinists v. United States Potash Co., supra. And see also Temco Aircraft Corp., 27 L.A. 233; Thompson Grinder Co., 27 L.A. 671; Continental Can Co., Inc., 29 L.A. 67; In re National Tube, 17 L.A. 790. Typical of these cases is the statement in Temco to the effect that "The recognition provisions of a collective bargaining contract mean that if the work is performed on the premises, which falls within the bargaining unit, then the contract operates. The obligations under the contract cannot be avoided by the easy device of a subcontract." And, in Thompson Grinder Co., supra, the arbitrator said: "If the company could thus abolish the labor force, it could, one by one, or group by group, abolish all classifications and rates of pay, and in effect nullify the entire agreement by the simple device

of employing contractors." While these interpretations of bargaining contracts are neither binding, nor for that matter, judicial pronouncements, they do reflect the non-legalistic thinking of those to whom parties to a labor contract have often entrusted the office of making the pragmatic adjustments so essential to the achievement of industrial peace. They are in consonance with the implied covenant in every contract "that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." 3 Williston (Rev.Ed., 1936) § 670, quoted in Local 1912 International Association of Machinists v. United States Potash Co., supra.

This reasoning makes good contract sense, and it makes good labor law sense. But its logic cannot be carried to the point of depriving the employer of the right to quit business and dispose of his property as he chooses. As applied in our case, it means that the Company may quit business and lease its operations to third parties, including former employees, provided there is a clean break between the cessation of operations and the leasing arrangement. The leasing arrangement must not be a subterfuge for evading obligations under the bargaining contract. It means then that the court should scrutinize the leasing contracts in the context in which they were executed to determine whether the Company actually quit business and relinquished management and control of its operations, or whether by the terms and conditions of the leasing agreements the Company actually retained management and control of the mining operations—in short, whether the parties did, in good faith, effect a lessor-lessee relation. In the determination of the ultimate question we will of course look to the policy of Section 301 to "promote a higher degree of responsibility upon the parties to such [bargaining] agreements, and * * * thereby promote industrial peace." Textile

Workers Union v. Lincoln Mills, supra [353 U.S. 448, 77 S.Ct. 917]. We may also draw upon the body of established law dealing with the distinctions between employer-employee and principal-contractor relationships. See 35 Am. Jur.Servants, § 5, p. 448; Williams v. United States, 7 Cir., 126 F.2d 129.

The trial court recognized the good faith limitations on the right of the Company to discharge its employees and substitute the leasing arrangements. It did not think the leasing arrangements could serve as a subterfuge for continuing the employer-employee relationship. But, it had no occasion to consider the bona fides or legal effect of the leasing arrangement since it took the view that in any event, the termination of the contract was an unfair labor practice and within the exclusive jurisdiction of the National Labor Relations Board. In that regard, the court was impelled by cases like Garner v. Teamsters, Chauffeurs and Helpers Local Union No. 776 (A.F.L.), 346 U.S. 485, 74 S.Ct. 161, 98 L.Ed. 228; and Guss v. Utah Labor Relations Board, 353 U.S. 1, 77 S.Ct. 598, 1 L.Ed.2d 601, which dealt with problems of federal preemption of asserted federal and state remedies for the same proscribed activities in the field of labor relations. See also United Const. Workers, Affiliated With United Mine Workers of America v. Laburnum Corp., 347 U.S. 656, 74 S.Ct. 833, 98 L.Ed. 1025; International Association of Machinists v. Gonzales, 356 U.S. 617, 78 S.Ct. 923, 2 L.Ed.2d 1018.

But our case does not involve any conflict between state and federal remedies, or private and public remedies. Rather we are concerned only with the exclusiveness of two federally created rights or remedies in the same legislative scheme, i. e., the Labor Management Relations Act. Section 301 of the Act is concerned with violations of contracts between an employer and a labor organization representing employees, the enforcement of which the Congress "left to the usual processes

of the law." See H.R. Conference Report No. 510, 80th Congress, 1st Sess., p. 42, U.S.Code Cong.Service 1947, p. 1147. "It expresses a federal policy that federal courts should enforce these agreements on behalf of or against labor organizations, and that industrial peace can be best obtained only in that way." See Textile Workers Union v. Lincoln Mills, supra; Independent Petroleum Workers of New Jersey v. Esso Standard Oil Co., 3 Cir., 235 F.2d 401.

■ The remedies for unfair labor practices under the Act were committed exclusively to the Board, but the Board's jurisdiction in that regard is limited to the effectuation of the purposes of the Act itself. The Board is not concerned with the enforcement of labor contracts between employer and Union representatives of employees. Indeed, it has been said that "breach of contract is not an 'unfair labor practice.'" Association of Westinghouse Salaried Employees v. Westinghouse Electric Corp., supra, 348 U.S. at page 443, 75 S.Ct. at page 491, 492, Note 2; Independent Petroleum Workers of New Jersey v. Esso Standard Oil Co., supra.

■ But even though the aggrieved incident or act can be said to be an unfair labor practice and within the jurisdiction of the Board, the courts are not thereby deprived of jurisdiction conferred by Section 301 to enforce the labor contract between the parties. There is no jurisdictional conflict, for the courts are concerned with the contract between the parties, the Board is concerned with the effectuation of the declared policies of the Act. See Lodge No. 12, Dist. No. 37, International Ass'n of Machinists v. Cameron Iron Works, 5 Cir., 257 F.2d 467.

■ But the trial court also thought the question was in any event moot and that it would serve "no purpose to curry this dead horse," citing Textile Workers Union v. Lincoln Mills, supra. And, this is true of course if, as in Lincoln Mills, the Company actually quit business, thereby terminating the contract.

But if, as contended, the leasing agreements are mere subterfuges for invading the bargaining contract, the contract will prevail and the court is assuredly vested with jurisdiction to declare and enforce the rights of the parties thereunder, even though it has expired during the litigatory process.

It follows that the case must be reversed and remanded with directions to determine the underlying purposes and legal effect of the leasing agreements in accordance with the views herein expressed.