CHAUFFEURS, TEAMSTERS AND HELPERS LOCAL UNION NO. 795, a labor organization affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Appellant,

v.

YELLOW TRANSIT FREIGHT LINES, INC., a corporation, Appellee.

CHAUFFEURS, TEAMSTERS AND HELPERS LOCAL UNION NO. 795, a labor organization affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Appellant,

v.

LEE WAY MOTOR FREIGHT, INC., a corporation, Appellee.

CHAUFFEURS, TEAMSTERS AND HELPERS LOCAL UNION NO. 795, a labor organization affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Appellant,

v.

WATSON BROS. TRANSPORTATION CO., Inc., a corporation, Appellee.

CHAUFFEURS, TEAMSTERS AND HELPERS LOCAL UNION NO. 795, a labor organization affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Appellant,

v.

FREIGHT WAYS, INC., a corporation, Appellee.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, LOCAL UNION NO. 795, an unincorporated association; S. E. Smith, individually and as President and business agent of said labor organization; John Doe, and Richard Roe, as individuals, officers, representatives and members of said Union, whose names and addresses are unknown and representatives of the class thereof, Appellants,

v.

TRANSCON LINES, a corporation, Appellee.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, LOCAL UNION NO. 795, an unincorporated association; S. E. Smith, individually and as President and business agent of said labor organization; John Doe, and Richard Roe, as individuals, officers, representatives and members of said Union, whose names and addresses are unknown and representatives of the class thereof, Appellants,

v.

McMAKEN TRANSPORTATION COMPANY, a corporation, Appellee.

Nos. 6272–6277.

United States Court of Appeals
Tenth Circuit.

Aug. 16, 1960.

Frank W. Hylton, Wichita, Kan., for appellants.

Malcolm Miller, Wichita, Kan. (Carl T. Smith, Robert C. Foulston, Wichita, Kan., Charles B. Blackmar and Franklin H. Mize, Kansas City, Mo., on brief), for appellees in Nos. 6272, 6273, 6274 and 6275.

Leonard F. Banowetz and F. C. McMaster, Wichita, Kan. (P. K. Smith and Stanford J. Smith, Wichita, Kan., on brief), for appellees in Nos. 6276 and 6277.

Before MURRAH, Chief Judge, and PHILLIPS and BREITENSTEIN, Circuit Judges.

MURRAH, Chief Judge.

Appellees, interstate motor carriers, brought these six separate suits under Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C.A. § 185, to enjoin the appellant labor union from violating the no-strike or tie-up provision of separate collective bargaining agreements between the Union and the appellees, covering the appellees' over-the-road and local cartage employees.[1] The appellant Union challenged the jurisdiction of the court to grant the claimed relief, on the grounds that the suits involved or grew out of a "labor dispute" as defined in the Norris-LaGuardia Act, which drastically restricts federal court injunctive power in such cases. See 29 U.S.C.A. §§ 101, 102, 104.

Upon a finding that the Union had violated the no-strike or tie-up provision of the bargaining agreements, and a showing of consequent irreparable harm, the court issued an injunction in each of the cases upon the hypothesis that no labor dispute within the meaning of the Norris-LaGuardia Act was involved, and that Section 301 of the Taft-Hartley Act conferred jurisdictional authority to grant the relief.

The primary questions then are (1) whether the court lacked jurisdiction under Section 301 of Taft-Hartley to issue the injunctions because of the jurisdictional restrictions in Norris-LaGuardia; and (2) if so, whether the relief granted was proper in the circumstances.

Section 301 of Taft-Hartley, 29 U.S.C.A. § 185, pertinently provides that "(a) Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce * * * may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." Section 4 of Norris-LaGuardia, 29 U.S.C.A. § 104, directs that "No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute * * * from doing, whether

---

1. All of the cases present identical questions of law on a common record, and were consolidated for trial. One set of briefs was filed in Cases Nos. 6272, 6273, 6274 and 6275. Separate briefs were filed in Cases Nos. 6276 and 6277. They are consolidated here for the purposes of consideration and disposition.

singly or in concert, any of the following acts: (a) Ceasing or refusing to perform any work or to remain in any relation of * * *, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence; * * *." Section 13(c) of the Act, 29 U.S.C.A. § 113(c), includes within its definition of "labor dispute", "any controversy * * * concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee."

Each of the collective bargaining agreements pertinently provide that " * * * there shall be no strike, lockout, tie-up, or legal proceedings without first using all possible means of settlement, as provided for in the agreement, of any controversy which might arise." [2] And, elaborate grievance procedures are provided for the settlement of all employee-employer disputes arising under the labor contracts. The appellant-Union represents all truck drivers, dockmen and warehousemen employed at employers' respective Wichita terminals, but does not represent their office and clerical employees. In July 1959, each employer received a letter from the Union advising them that the Union was embarking on a campaign to organize appellees' clerical workers, and would commence picketing their terminals about three days hence. The letters specified that the Union was making no demand of any kind upon any of the employers, and that the only purposes of the picketing were to call the attention of its members and supporters to the fact that the employers' clerical workers were not members, and to induce them to join. However, when pickets appeared at each of employers' terminals, all

Union employees honored the picket lines, and remained away from their jobs as long as the pickets were present, thus tieing up the employers' terminal operations. After a day or so of this picketing, the employers brought these suits resulting in the injunctive order complained of.

The employers alleged and the Union admitted that the enjoined picketing activities did not relate to any grievance under any of the contracts, i. e., there was no dispute between the employers a...1 the covered employees concerning wages and hours or conditions of employment—the subject matter of the bargaining contract. The Union earnestly contends, however, that the controversy does involve a Norris-LaGuardia "labor dispute" because by the picketing activities, it is seeking to arrange terms and conditions of employment in the general type of business in which the employers are engaged and in an area of work where the Union represents some of the employees. See 29 U.S.C.A. § 113. The Union takes the position that a "labor dispute" having thus been shown, the court was without jurisdiction under Section 301 because Section 4 of Norris-LaGuardia expressly prohibits judicial restraint of such activities. We are thus brought face to face with the problem of reconciling the jurisdictional grant in Section 301 of Taft-Hartley and the drastic curtailment of it in Norris-LaGuardia.

Peaceful organizational picketing has been held to involve or grow out of a labor dispute within the meaning of Section 13(c) of Norris-LaGuardia. Aetna Freight Lines v. Clayton, 2 Cir., 228 F. 2d 384. The court there thought it sufficient to the application of Norris-LaGuardia if the peaceful organizational activities were intended to arrange terms and conditions in the general type of business in which the employer was engaged. Id., at page 386.

2. This and other provisions quoted from the collective bargaining contracts are from the "Over-the-Road Motor Freight Agreements." Parallel provisions appear in the "Local Cartage Agreements."

And the conflict between affirmative jurisdiction of suits for violation of labor contracts under Section 301 of Taft-Hartley, and the jurisdictional bar to injunctive relief under Section 4 of Norris-LaGuardia was squarely presented in A. H. Bull Steamship Co. v. Seafarers' International Union, etc., 2 Cir., 250 F. 2d 326, where an employer-employee controversy over wage renegotiations was held to involve or grow out of a labor dispute within the meaning of Norris-LaGuardia. Resolving the conflict, the court concluded that the jurisdictional limitations of Norris-LaGuardia survived Section 301 of Taft-Hartley to bar the enforcement of the no-strike clause in the subsisting labor contract. The court drew a clear distinction between the enforcement of the agreement to arbitrate in the interest of industrial peace in Textile Workers Union of America v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972, and the power to enjoin peaceful picketing as in our case. It did not think that merely because an agreement to arbitrate is specifically enforceable as a quid pro quo for an agreement not to strike, it followed that the court was thus empowered to specifically enforce the agreement not to strike. The court reasoned that if the mandate of Section 4 of the Norris-LaGuardia Act was to be repealed as an expression of national policy, it should be changed by Congress, and not by "judicial legislation or inventiveness."

It is true that Lincoln Mills was concerned only with the agreement to arbitrate in a labor contract, and it is also true that the injunctive enforcement of such agreements was not one of the abuses against which Norris-LaGuardia was aimed. But even so, it seems plain enough that the court in Lincoln Mills did not intend to confine Section 301 jurisdiction to the specific performance of arbitration clauses in labor contracts. Rather, we think the court had in mind a much broader concept of jurisdictional authority—one which embraced all violations of labor contracts which had been freely arrived at through the collective bargaining process. This broader jurisdictional concept is evidenced by the court's cognizance of Congressional concern for union responsibility for its collective bargaining contracts, and with "procedure for making such agreements enforceable in the courts by either party" in accordance with the usual processes of the law. 353 U.S. at page 453, 77 S.Ct. at page 916. Further evidence of the broader concept is found in the court's reference to the Railway Labor Act cases, in which the court had readily subordinated Norris-LaGuardia restrictions to the mandates of the Railway Labor Act. See Virginian Ry. Co. v. System Federation, etc., 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789; Graham v. Brotherhood of Locomotive Firemen and Enginemen, 338 U.S. 232, 70 S.Ct. 14, 94 L.Ed. 22.

■ Surely no one would seriously contend that Section 301 was intended to open the gates to the abuses of judicial injunctive power which Norris-LaGuardia was designed to curb. We ought always to be mindful of the very limited function the courts play in the collective bargaining process. Yet it seems reasonable to say that if the courts are to exercise jurisdiction for the redress of violations of collective bargaining agreements according to notions of federal common law, they are empowered to vouchsafe the integrity of a bargaining contract to the end that neither party shall be deprived of the fruits of their bargain. See United Steelworkers of America, etc. v. New Park Mining Co., 10 Cir., 273 F.2d 352; Local 1912, International Association of Machinists v. United States Potash Co., 10 Cir., 270 F.2d 496. And this is so, we think, whether the claimed violation is a refusal to arbitrate according to the terms of the contract, or the violation of an agreement not to strike or tie up the employer's business without first resorting to the grievance procedure prescribed in the contract. It is one thing to utilize an injunctive decree for the negative purpose of interfering with full freedom of association, self-organiza-

tion and designation of representatives to negotiate the terms and conditions of employment. It is quite another to utilize the judicial processes to preserve and vouchsafe the fruits of a bargain which the parties have freely arrived at through the exercise of collective bargaining rights. See 29 U.S.C.A. § 102.

While this controversy may come within the literal reading of Norris-LaGuardia, we think the jurisdictional limitations there must be read in the light of the language and underlying purpose of Section 301, "so that the obvious purpose in the enactment of each is preserved." Brotherhood of Railroad Trainmen v. Chicago R. & I. R. Co., 353 U.S. 30, 40, 77 S.Ct. 635, 640, 1 L.Ed. 2d 622. Thus construed, we think the court had jurisdiction to entertain the employers' suits for violation of the subsisting labor contract.

This brings us to a consideration of the proper exercise of that jurisdiction. The agreement not to strike or tie up the employers' operations without first using all possible means to settle any controversy, is found in Article VIII, entitled "Grievance Machinery and Union Liability." On its face and standing alone, the language seems too clear for doubt. But the Union invokes another equally explicit provision of the contract in the following Article IX, entitled "Protection of Rights", providing that "It shall not be a violation of the Contract * * * if any employee or employees refuse to go through the picket line of a union * * *." And, nothing in the contract purports to limit the Union's use of peaceful organizational picketing to publicize a labor dispute.

These respective contentions plainly pose a question concerning the interpretation of what appears to be conflicting provisions of the labor contract. And, the contract specifically provides that "all matters pertaining to the interpretation of any provision of this contract may be referred, at the request of any party, at any time, for final decision to * * *" joint committee arbitration in accordance with the elaborately prescribed procedures, including "umpire handling."

■ The parties having thus reserved unto themselves the function of interpreting their own contract in the event of dispute, the interpretive function of the court should be at an end for "We interpret only to determine whether the grievance dispute can be fairly said to present a question as to the interpretation or application of the contract." Local 1912, International Association of Machinists v. United States Potash Co., supra, 270 F.2d at page 498. And this is so even though we may think the contract can be correctly interpreted only one way. Id. Thus, upon application of either party, it would be the limited function of the court to enforce the agreement to arbitrate in accordance with the usual process of the law.

While vehemently claiming wholly inconsistent rights under the contract, both parties denied the existence of any arbitrable grievance. Neither party invoked the grievance machinery until after the court had entered its injunctive decrees, whereupon the Union invoked the grievance machinery for the apparent purpose of obtaining damages by way of costs and attorney fees incurred in the injunctive proceedings, which they claim were in violation of their contractual rights.

■ Upon petition of the employers, the court enjoined the grievance proceedings as "an attempt to relitigate a matter litigated, determined and adjudicated by this court." The record indicates that the latter injunctions were entered on stipulation of the parties as to their propriety. And, it is thus clear that the parties deliberately and voluntarily submitted the arbitrable question involving the interpretation of the contract to the court, and that the court by its judgment interpreted it as giving controlling effect to the no-strike and no-tie up provisions of the contract.

Both parties having waived their contractual right to have their dispute referred to the grievance procedure; and

having elected to submit the question of interpretation to the court, and agreed that the court's judgment thereon should be exclusive of the right of referral, it became the province of the court to interpret the contract, and our only question is the correctness of that interpretation.

It is true, as the Union suggested, that the no-strike or tie-up provision of the contract is part and parcel of Article VIII, which provides for the grievance procedure. And, from this the Union argues that the agreement not to strike is conditioned upon the referral of a dispute to grievance procedure. And, since the parties deny the existence of a dispute, and since there has been no referral or submission to grievance procedure, the no-strike provision is inoperative and cannot therefore form the basis for injunctive relief.

■ The short and conclusive answer to this, we think, is that there does exist a dispute concerning the interpretation of the contract. True, the parties did not choose to refer it to the grievance procedure, but as we read the contract, the agreement not to strike is not conditioned upon referral. Instead, it provides that there shall be no strikes or tie-ups without first using all possible means of settlement as provided for in the agreement. To us, this crucial language means that the use of all possible means of a settlement as provided in the agreement is a prerequisite to the right to strike. The obvious purpose of this provision of the contract was to insure industrial peace through conciliation by agreeing not to strike, lock out or tie up the employers' operations until the elaborate procedure for conciliation of disputes under the contract was exhausted. Read in this light, the no-strike provisions are applicable, and when considered in the context of the whole contract and their institutional purposes toward conciliation, we agree with the trial court that it takes precedence over the contractual right to honor a picket line, especially a picket line which the Union itself has established, and which results in the complete disruption of the labor relations established by the subsisting contract.

The judgments are affirmed.