**MINNESOTA JOINT BOARD, AMALGAMATED CLOTHING WORKERS OF AMERICA, and the Amalgamated Clothing Workers of America, Appellants,**

v.

**UNITED GARMENT MANUFACTURING CO., a Corporation, Appellee.**

No. 17199.

United States Court of Appeals
Eighth Circuit.

Nov. 9, 1964.

See also D.C., 211 F.Supp. 414.

Clifford D. Reznicek, Asst. Gen. Counsel, Amalgamated Clothing Workers,

New York City, made argument for appellants and filed brief with Hall, Smith, Hedlund, Juster, Forsberg & Merlin, Minneapolis, Minn., and Jacob Sheinkman, New York City.

Joe A. Walters, of O'Connor, Green, Thomas & Walters, Minneapolis, Minn., made argument for appellee and filed brief with Thomas A. Keller, III, Minneapolis, Minn.

Before JOHNSEN, Chief Judge, MATTHES, Circuit Judge, and GIBSON, District Judge.

JOHNSEN, Chief Judge.

This appeal has been permitted to be taken under 28 U.S.C.A. § 1292(b). It is from an order of the District Court denying a motion by a local union and an international union to have a suit against them for damages stayed and to require the employer to submit the controversy and claim involved to arbitration under the provisions of the parties' collective bargaining agreement. We think the court erred in denying the motion and accordingly vacate the order.

The action was one instituted under § 301(a) of the Labor Management Relations Act, 29 U.S.C.A. § 185(a), for alleged violation of the no-strike clause contained in the bargaining agreement. By this clause the parties had agreed that "there will be no strikes, sit-downs or lock-outs during the term of this Agreement". The unions' obligation in this respect was, however, qualified by a proviso making it subject to the recognition contained in a "Supplemental Agreement" (covering payments by the employer to the international union's retirement and insurance fund) of a right in the union to "direct its members to discontinue work in the plant" for any delinquency in such payments, which continued for five days, and of which the union received written notice from the trustees of the fund.

The language of the arbitration clause of the bargaining agreement was as follows: "If any controversy arises over the interpretation of or adherence to any of the provisions of this Agreement and if such controversy cannot be determined by the parties hereto, the matter shall be referred to a Board of Arbitration * * (which) shall hear * * * and finally determine the controversy". There were provisions for setting up a board of arbitration, as well as provisions for attempting to effect resolution of grievances before the arbitration stage was reached, but these are not material here.

The strike involved was called in October 1959 and lasted for a period of ten days to two weeks. It was prompted apparently by the employer's refusal to engage in any negotiations for modification of the bargaining agreement. At the time, however, the employer was also delinquent in its payments to the retirement and insurance fund.

Settlement of the strike was made by a "Memorandum of Agreement" executed on October 15, 1959. The suit of the employer against the unions was instituted in October 1960. It was the employer's contention that the bargaining agreement had an absolute term from May 24, 1957, to May 31, 1961, during which the unions had no right to insist on changes in or negotiations for modification of the contract. The unions contended that the bargaining agreement left them with a right to demand changes and negotiations for modification after the first year of the term, by giving written notice of their desire therefor sixty days "prior to May 31st of any year", and that the giving of such a notice terminated the further operation of the agreement.

By the language of the bargaining agreement, the term thereof was to commence on May 24, 1957, "and shall continue up to and including May 31, 1961, and from year to year thereafter, unless sixty (60) days' notice in writing by registered mail from either party to the other be given prior to May 31st of any year of intention to modify or amend this Agreement". Immediately following this there was a provision that "if at any time during the term of this Agreement", by reason of economic conditions or other causes affecting the industry, "either of

the parties considers it necessary to modify wages * * * a conference may be requested to discuss such modification by giving sixty (60) days' written notice to the other party prior to the anniversary date".

On January 26, 1959, the local union sent a letter to the employer giving notice of its desire "to modify certain of the terms and conditions" of the agreement, without making specification of its demands but simply stating that it would discuss them at a mutually-agreed-upon meeting. As previously indicated, the employer refused to engage in any negotiations for modification on the contention that the agreement provided for no right to demand changes or bargaining negotiations except in relation to any continuance or extension of it beyond May 31, 1961. Without attempt by the union to have arbitrated whether its interpretation of the agreement or that of the employer was correct on the question of the right to seek modification and the obligation to negotiate before May 31, 1961, a strike was called in October 1959.

█ Clearly, the contention of the unions that a right existed under the contract to insist upon modification and negotiation in 1959, and the contention of the employer that no such right was provided for under the contract until 1961, presented a "controversy * * * over the interpretation of * * * the provisions" of the bargaining agreement. Equally was there involved a "controversy * * * over * * * adherence to * * * the provisions" of the bargaining agreement in the employer's contention that the unions' action was in violation of their no-strike obligation, and in the unions' contention that the notice of desire for modification and the employer's refusal to negotiate entitled them to regard the bargaining agreement as no longer in effect.

█ Further, insofar as the unions sought to justify the strike on the employer's delinquency in payments to the retirement and insurance fund, was there presented a controversy both over interpretation of and over adherence to the provisions of the contract, on the employer's contentions (1) that the unions could not at the time have called a strike under the exemption provision of the supplemental agreement, because this provision required as a condition precedent to the right to strike receipt by the unions of a written notice from the trustees of the fund in necessary proof of the default, and (2) that the right was in any event one to discontinue work only to obtain payment of the employer's arrears, so that a use of it to make other demands and a refusal to return to work unless these were met would not be within its privilege and therefore would constitute a violation of the general no-strike clause.

In this connection, it might be noted that the "memorandum of agreement", dated October 15, 1959, by which the strike was settled, made no mention of the employer's arrears to the retirement and insurance fund. It declared that "the agreement now in effect will continue until May 31, 1961", and provided that the parties were agreeing to a settlement of an additional ½% contribution being made by the employer to the "health fund"; of wages being increased "5% across the board"; and of another holiday being granted the employees, if this should be accorded on a national basis in the industry.

In summary, all the matters which have been referred to clearly were on their face questions which the parties, for purpose of any dispute between them, had bound themselves to have arbitrated and as to which they had agreed that "a Board of Arbitration * * * shall hear * * * and finally determine the controversy".

██ The right to have all controversies over interpretation of or adherence to the provisions of the bargaining agreement submitted to and determined by arbitration was one existing in favor of both parties. Neither could deprive the other of any aspect of the right either in scope or in incident. Thus it would

not be possible for one party to remove such a controversy from the field of arbitrability because it undertook to make it the subject of a claim for legal damages against the other. So long as the claim arose out of the contract and turned on an issue of interpretation of or a question of adherence to its provisions, the matter of damages related thereto would constitute merely an element or incident in the arbitrational disposition of the controversy. There could not be room for contention otherwise, except where it was demonstrable by clear language or from compelling construction engaged in by the parties that they intended to exclude the question of damages as an arbitrable element or incident of any controversy between them.

■■ Nor would a party who desired such a controversy finally determined, either for purpose of damages or of industrial peace alone, be released from its obligation to have this done by arbitration because the other party had engaged in action which could be contended to be in disregard of the obligation on its part to arbitrate. Such action would have to represent more than a mere ignoring of the obligation to arbitrate. It would have to constitute a repudiation of the obligation itself.[1]

■ The unions are not shown to have engaged in any such repudiation as to the controversy involved. As heretofore stated, it was their position that the giving of notice by them in 1959 of desire for modification and negotiation left the bargaining agreement without further term and operation, not from repudiation on their part, but as a matter of terminating effect from its provisions. They also contended that the no-strike clause further could have no application to the situation because the employer was at the time in arrears on its payment to the retirement and insurance fund and that thus their action could not be claimed to be unlawful. The employer made the counter-contentions that the contract gave the unions no right to demand modification until 1961, so that there could be no terminating effect under its provisions from a serving of the 1959 notice, and that the arrears in payment to the retirement and insurance fund could not be relied on as a justification for the strike, since the unions acted without having received a written notice from the trustees of the fund, and in addition they used the strike not for the purpose of obtaining payment of the arrears, but as a means of making and enforcing other demands.

Of course, upon the employer's interpretation of the contract being made known to the unions, they could and should, as a matter of preserving industrial peace, have requested arbitration of the question as to which of them was right in its construction. On the other hand, when the unions indicated their intention to strike, the employer equally, in the interest of industrial peace, could and should have sought arbitration of the question of interpretation and of whether there was adherence by the unions to their obligation in presuming to strike. Both parties apparently chose to disregard their right respectively to seek timely arbitration. With nothing more than

---

1. The terms "waiver" and "estoppel" are referred to in Drake Bakeries, Inc. v. Local 50 American Bakery, etc., 370 U.S. 254, 262, 82 S.Ct. 1346, 1351, 8 L.Ed.2d 474, but they do not appear to be given recognition legalistically on whether the other party should be held to be excused from its obligation to arbitrate. The opinion seems to leave the question turning on actual repudiation. In Local Union No. 721, United Packinghouse, etc. v. Needham Packing Co., 376 U.S. 247, 253, 84 S.Ct. 773, 777, 11 L.Ed.2d 680, without reference to the term "estoppel", the Court engaged in the observation that "Whether a fundamental and long-lasting change in the relationship of the parties prior to the demand for arbitration would be a circumstance which, alone or among others, would release an employer from his promise to arbitrate, we need not decide, since the undeveloped record before us reveals no such circumstance". On the decisions as they stand, there is no basis for us to deal with the question here except as a matter of repudiation.

this, there is no basis to say that either of them had repudiated its obligation to arbitrate, as having demonstrated that it thereby was intending to refuse to submit the matter to arbitration if it was called upon to do so.

What has been said is in effect a restatement of the principles which are enunciated or implied in the opinions of the Supreme Court in United Steel Workers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409, Drake Bakeries, Inc. v. Local 50, American Bakery, etc., 370 U.S. 254, 82 S.Ct. 1346, 8 L.Ed.2d 474, Local Union No. 721, United Packinghouse, etc., v. Needham Packing Co., 376 U.S. 247, 84 S.Ct. 773, 11 L.Ed.2d 680 and other cases. Only two quotations will here be set out.

In the Drake case the Court said, 370 U.S. at 261–263, 82 S.Ct. at 1351: "Moreover in this case, under this contract, by agreeing to arbitrate all claims without excluding the case where the union struck over an arbitrable matter, the parties have negatived any intention to condition the duty to arbitrate upon the absence of strikes. They have thus cut the ground from under the argument that an alleged strike, automatically and regardless of the circumtances, is such a breach or repudiation of the arbitration clause by the union that the company is excused from arbitrating, upon theories of waiver, estoppel, or otherwise. Arbitration provisions, which themselves have not been repudiated, are meant to survive breaches of contract, in many contexts, event total breach; and in determining whether one party has so repudiated his promise to arbitrate that the other party is excused the circumstances of the claimed repudiation are critically important".

In the Needham case, the Court similarly stated, 376 U.S. at 252, 84 S.Ct. at 776: "Nothing in the agreement indicates an intention to except from Needham's agreement to arbitrate disputes concerning the 'interpretation or application' of the agreement any dispute which involves or follows an alleged breach of the nostrike clause. That the nostrike clause does not itself carry such an implication is the holding of Drake Bakeries.

The District Court failed to give the Supreme Court decisions the plenary significance which it seems apparent that they must be accorded in this special field with its own developing common law. Thus the court engaged in a restrictive reading and sought to distinguish the Drake case on its facts. Further, it regarded as of dominant importance the circumstances that the employer's plant had been closed and its operations discontinued since shortly after the strike was settled; that the term of the bargaining agreement also had now expired; and that there thus was no longer involved any relations between the parties, so that "there is no industrial harmony to be promoted between them". On this basis it concluded that "there is no purpose in requiring the parties to adhere to a method of settling their disputes under a contract which no longer exists".

But the parties had bound themselves to use this method to dispose of ("finally determine") any controversy arising between them over the interpretation of or adherence to any of the provisions of the contract. They had not excepted from this disposition controversies which would arise in their relationship but which might not be finally determined by the time that the agreement expired. And in this connection, the provisions for setting up a board of arbitration were not such as would be unable to be carried out after the contract term expired.

In fact, it could not even be said that the national policy of fostering arbitrational settlement of labor-management disputes in promotion of industrial peace and stability would be incapable of being served because the plant and operations involved had been discontinued and the term of the agreement had expired. In-

sofar as arbitrational procedure is capable of furthering that end, its success is dependent upon recognition, acceptance and use of it on a general basis and not on considerations of whether it is needed to effect or restore peace in a particular situation.

Finally, it should be added that the cases provide no authority for not requiring an arbitration clause to be enforced after the contract has expired, as to a breach occurring during the term. The holdings are to the contrary. See Item Co. v. New Orleans Newspaper Guild, 256 F.2d 855, 857 (C.A.5, 1958); Procter & Gamble Independent Union of Port Ivory, N. Y. v. Procter & Gamble Mfg. Co., 312 F.2d 181, 186 (C.A.2, 1962); United Steelworkers of America v. New Park Mining Co., 273 F.2d 352, 358 (C.A.10, 1959); Piano & Musical Inst. Wkrs. U., Local 2549 v. W. W. Kimball Co., 221 F.Supp. 461, 464 (D.C.N.D. Ill.1963); General Tire & Rubber Co. v. Local No. 512, etc., 191 F.Supp. 911, 914 (D.C.R.I.1961) aff'd 294 F.2d 957 (C.A.1, 1961).

The expression of the Procter & Gamble Case, 312 F.2d at 186, is sufficient in illustration: "Grievances which are based upon conditions arising *during the term of the agreement to arbitrate* are arbitrable after that term has ended". (Emphasis contained in the opinion).

Similarly, as to the significance which the court here accorded to the circumstance that the employer's plant had been closed and its operations discontinued, there may be noted the recognition which the Supreme Court gave in Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 459, 77 S.Ct. 912, 919, 1 L.Ed.2d 972, to claims of employees for back pay arising before the operations there involved were terminated as constituting a continuing arbitrable controversy.

The order of the District Court is vacated and the cause is remanded with directions to grant the motion for stay pending arbitration.

Order vacated and cause remanded.