**TEAMSTERS LOCAL NO. 961, an unincorporated association, Plaintiff,**

v.

**GRAVES TRUCK LINE, INC., a Kansas Corporation, Defendant.**

**Civ. A. No. 80–K–1501.**

United States District Court, D. Colorado.

Dec. 10, 1980.

---

Philip Hornbein, Jr., Hornbein, MacDonald, Fattor & Buckley, Denver, Colo., for plaintiff.

Jeffrey L. Madoff, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., Paul E. Goodspeed, Coghill & Goodspeed, Denver, Colo., for defendant.

## ORDER GRANTING PRELIMINARY INJUNCTION

KANE, District Judge.

The Teamsters Local No. 961, the union for the clerical and office employees at Graves Truck Line, Inc., seeks an injunction restraining Graves from transferring its business operations to Garrett Freight Lines, Inc., allegedly in violation of its collective bargaining agreement with Graves. Graves transports freight as a common carrier and maintains a terminal and office in Denver. Jurisdiction is proper under the Labor Management Relations Act, 29 U.S.C. § 185(a).

Two provisions of the collective bargaining agreement are in dispute. First, Local

961 alleges the transfer of operations from Graves to Garrett is attempting to be made without the submission of the dispute to the appropriate Change of Operations Committee, and second, it alleges the transfer is attempting to be made without Graves requiring Garrett to assume the terms and conditions of its collective bargaining agreement with the Graves' office and clerical employees.

■ Local 961 is seeking a *Boys Markets* injunction in this action. *See Boys Markets, Inc., v. Retail Clerks Union, Local 770*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), *Chief Freight Lines Co. v. Local Union No. 886*, 514 F.2d 572 (10th Cir. 1974). The Tenth Circuit stated in *Chief Freight* that the essential requirements for issuing an injunction under *Boys Markets* are that there exist a collective bargaining agreement containing a mandatory grievance or arbitration procedure and that the union be under a contractual duty not to strike. *Id.* at 580. The obligation of the employer to arbitrate is the *quid pro quo* of the agreement by the union *not to take concerted activity disruptive of normal business practices such as strikes*. Beyond this I must consider "whether issuance of an injunction would be warranted under ordinary principles of equity—whether breaches are occurring and will continue, or have been threatened and will be committed; whether they have caused or will cause irreparable injury [to the movant]; and whether the [movant, in this case the union] will suffer more from the denial of the injunction than will the [employer] from its issuance." *Boys Markets, Inc. v. Retail Clerks Union, Local 770*, 398 U.S. at 254, 90 S.Ct. at 1594 (*quoting Sinclair Refining Co. v. Atkinson*, 370 U.S. 195, 82 S.Ct. 1328, 8 L.Ed.2d 440 (1962) (dissent)). *See also Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir. 1980).

I have determined under the requirements of *Boys Markets* that arbitral issues exist and that the parties' collective bargaining agreement requires the resolution of these disputes by a grievance and arbitration proceeding. In addition, I find that the injury to Local 961 and its represented employees outweighs any injury which might be incurred by the defendant in carrying out its transfer of operations. It is abundantly clear that the company must resolve many issues with its union-represented employees before carrying out this proposed change of operations. Further, I note the Supreme Court's ruling in *Buffalo Forge v. United Steelworkers of America*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976), does not apply because the court specifically indicated that activity which has the "purpose [or] effect of denying or evading an obligation to arbitrate . . .," *id.* at 408, 96 S.Ct. at 3148, was subject to a *Boys Markets* injunction. *See Teamsters Local 764 v. Branch Motor Express Co.*, 463 F.Supp. 282, 287 (M.D.Pa.1978).

Article 8, section 6 of the National Master Freight Agreement between Graves and the Teamsters-represented employees states that:

(a) Present terminals, breaking points of domiciles shall not be transferred or changed without the approval of an appropriate Change of Operations Committee. Such Committee shall be appointed in each of the Conference Areas, equally composed of Employer and Union representatives. The Change of Operations Committee shall have the authority to determine the seniority of the employees affected and such determination is binding.

Article 44, section 4 of the Supplemental Agreement covering office employees in the Western States Area states that:

Present terminals, breaking points, or domiciles shall not be transferred or changed nor shall there be any transfers of equipment between terminals which will adversely affect the employment opportunities of the employees at the terminal from which such transfer of equipment is to be made without the Employer first having asked for and received approval from the Committee on Change of Operations, the members of which shall be appointed by the Joint Western Area Committee at each regular meeting. This shall not apply within the estab-

lished city cartage radius of the individual Local Union. This Committee shall also have jurisdiction over the closing of terminals in regard to seniority.

Further, under subsection (b) to Article 8, section 6, the National Freight Master Agreement states that "[t]he National Grievance Committee shall adopt Rules of Procedure concerning the application of this Article."

On July 8, 1980, both Graves and Garrett submitted a request to the National Grievance Committee for change of operations to be heard at the next multi-conference change of operations committee meeting of the Western States Joint Area Committee. The request stated that "[t]his change, although involving only the Denver area of operations, is multi-conference in nature due to the overlap into the Western and Central Conferences of the Denver Operation." It should be noted that the change requested involves not only the office employees but a consolidation of the Denver trucking terminals involving local pick-up and delivery drivers, over-the-road, long-distance drivers, and a sales force. The same union locals represent the respective units of pick-up and delivery and over-the-road drivers.

By direction of the National Grievance Committee, dated July 11, 1980, the Joint Change of Operations Committee convened on August 12, 1980. The Committee indicated at that time that it had no jurisdiction over the merger of the office units because of the presence of a foreign union, the Office and Professional Employees International Union, Local No. 5, AFL–CIO ("OPEIU"), as representatives for the office workers at Garrett. For reasons not relevant here, the companies withdrew their change proposal at this meeting without prejudice to refile.

Graves and Garrett subsequently made some attempts to contact their respective unions for the office workers to reconcile differences. It should also be noted that this proposed change was first discussed informally with the respective unions in July of 1980 to no avail. Both Graves and Garrett filed a second request for change of operations and on October 8, 1980, the National Grievance Committee again assigned the request to the Multi-Conference Change of Operations Committee for the Western States and Central States areas. The Committee convened on November 4, 1980. The written request before this committee omitted any reference to the office employees, apparently because of the committee's assertion in the August meeting of its lack of jurisdiction. At the hearing, however, the Garrett spokesman expressly amended the formal change submission to include the office units. Again, the Joint Change Committee held that it had no jurisdiction under Article 8 or Article 44 to rule on a change of operations involving a non-Teamsters union (OPEIU).[1]

■ At both the August and November meetings the Committee, in discussing the resolution of the dispute between the unions and the respective companies regarding the office and clerical employees, made it clear that this matter was obviously one for determination after the merger in the form of a unit clarification petition before the National Labor Relations Board. However, the obligation of the employer Graves to its office employees remains under the contract to submit this dispute to a change of operations committee, i. e., to arbitrate these types of differences, or to require that the terms and conditions of their collective bargaining agreement be assumed by an acquiring firm prior to consolidation. On the first allegation of breach of contract I conclude in this preliminary hearing that although Graves has complied with the express terms of both Article 8 and Article 44,

---

1. The Union Committee member Red Fularczyk stated:
     "That's it. If the company so desires to put those [office] people in the terminal, it's a local issue, as explained thoroughly previously, it's a local issue and not a Multi-Confer-

ence issue. It is not part of this change, as far as we determined in executive session. Take your best hold, brother, and hold on." (Transcript of November 4, 1980, hearing, at p. 22.)

it has failed to take all reasonable means to meet the good faith intention of its agreement to settle disputes by means of arbitration.

■ Local 961 now suggests that the multi-conference committee was the improper committee on change of operations to which this dispute should have been submitted under the contract. It has recently attempted to renew the grievance/change of operations procedure by filing, on November 18, 1980, a request for hearing with the Joint Colorado-Wyoming State Committee. That meeting ended in a deadlock. Regardless of Local 961's arguments that other means of arbitrating this issue exist under the change of operations section of the collective bargaining agreement, I disagree. None of the parties disputed the authority of the Joint Committee to hear the change of operations as to the other aspects of the consolidation and all parties accepted the Committee's determination that it had no authority to rule on the dispute regarding the office and clerical employees. The Joint Committee's authority, established by the respective collective bargaining agreements and by the procedures set forth by the National Grievance Committee, is proper. Its decision regarding lack of jurisdiction should be accorded finality. *Truck Drivers Union v. Riss & Co.*, 372 U.S. 517, 83 S.Ct. 789, 9 L.Ed.2d 918 (1963), *Bell v. IML Freight, Inc.*, 589 F.2d 502, 506 (10th Cir. 1979). Even if Local 961 were to pursue the recently filed grievance with the Joint State Committee, neither that committee nor any other appointed by the National Grievance Committee or the Western States Area Committee to hear this change of operations could assert jurisdiction over a foreign, non-Teamster union (OPEIU) to resolve the seniority and dovetailing disputes that will naturally ensue from consolidation of these two companies. Article 2, section 3 of the National Master Freight Agreement, and Article 40, section 1(b)(2) of the Western States Supplement state that neither agreement is applicable to employees represented by non-Teamster unions. Therefore, I am without power to order equitable relief in the form of requir-

ing a change of operations committee to hear this matter and to resolve this particular dispute as contemplated by the contracts. But I am not compelled to conclude that Graves exhausted every contractually-required means of arbitration available to resolve the dispute.

■ The second aspect of the alleged breach of contract asserts that Graves violated Article 1, section 3 of the National Master Freight Agreement, *to-wit*:

> In the event the entire operation, or rights only, are sold, leased, transferred, or taken over by sale, transfer, lease, assignment, receivership, or bankruptcy proceedings, such operation or use of such rights shall continue to be subject to the terms and conditions of this Agreement for the life thereof.

> \* \* \*

> In the event the Employer fails to require the purchaser, transferee, or lessee to assume the obligations of this Agreement, the Employer ... shall be liable to the Local Union and to the employees covered for all damages sustained as a result of such failure to require assumption of the terms of this Agreement, but shall not be liable after the purchaser, the transferee or lessee has agreed to assume the obligations of this Agreement.

On November 10, 1980, Graves sent a letter to Local 961 stating that it would require Garrett to assume the Teamsters contract covering Graves' office employees in the event of a consolidation. On November 11, 1980, Garrett sent a letter to Local 961 stating it would assume the Teamsters contract. By agreeing Garrett thus committed itself to recognizing two units of office employees represented by two different unions. It is manifestly clear, however, that Garrett's, as well as Graves', intention is that this "assumption" is certain to result in a *unit clarification* dispute which admittedly is within the exclusive jurisdiction of the National Labor Relations Board. Labor Management Relations Act, 29 U.S.C. § 159. *See Gordon v. Laborer's Int'l Union of No. America*, 490 F.2d 133, 138 (10th Cir.), *cert.*

*denied,* 419 U.S. 836, 95 S.Ct. 63, 42 L.Ed.2d 62 (1973), *St. Vincent Hospital v. National Labor Relations Board,* 621 F.2d 1054, 1057 (10th Cir. 1980).

While I do not dispute the authority of the Board to resolve representation questions, in the context of this case I question whether the alleged "assumption" of "the terms and conditions of the collective bargaining agreement for the life thereof" is a maleficent act on the part of the companies to subvert the arbitration goals of the agreement. Although Garrett is not legally disabled from assuming the existing Graves office contract and from thereafter seeking resolution with the Board of any disputes as to representation which may arise in the single office, under its collective bargaining agreement Graves cannot transfer its operations unless Garrett fully accepts the Local 961 contract. While I have been admonished by counsel in this case and by the courts not to prejudge the arbitrators of disputes such as this, *see, e. g., Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554, 562–563, 96 S.Ct. 1048, 1055, 47 L.Ed.2d 231, it is precisely because Graves' actions may be an abrogation of its contractual obligations that the dispute must be submitted to the grievance procedure and to arbitration. Far from being "futile," such a mandate to Graves and Local 961 to arbitrate these disputes before the Western States Area Committee, or in whatever other forum they choose, should force an agreement as to whether Graves can transfer its business in conformance with the contract with the possibility of a unit clarification proceeding under the NLRA or whether the parties must first resolve seniority questions, as well as pension benefits and other matters of concern to the office employees, prior to the transfer. It is not for me, but rather an arbitrator to decide. And that was obviously the intention of the parties in striking the collective bargaining agreement.

Article 45 of the Western States Supplement establishes a grievance and arbitration procedure which provides, *inter alia:*

> The Union and the Employer ... agree that there shall be no strike, lockout, tie-up or legal proceedings without first using *all possible* means of settlement as provided for in this supplemental Agreement and in the National Agreement, *if applicable,* of any controversy which may arise. (Emphasis added.)

In *United Steelworkers of America v. New Park Mining Co.,* 273 F.2d 352 (10th Cir. 1959), the Tenth Circuit made clear that a trial court cannot compel arbitration when there is no agreement to arbitrate. *Id.* at 355. However, in that case the court concluded that the trial court had jurisdiction to require an employer to arbitrate grievances and jurisdiction to appoint an impartial arbitrator to do so where the employer used a subterfuge to avoid the contractually-required grievance procedure. Here, because the contractually-provided change of operations procedure is a nullity, Graves claims it can walk away from its clear intent in the contract to arbitrate all grievances. The Tenth Circuit says, however, that this "construction of [the] collective bargaining contract ignores the covenant of good faith and fair dealings which must inhere in every collective bargaining contract if it is to serve its institutional purposes." *Id.* at 356. The Supreme Court has reaffirmed "the strong policy favoring judicial enforcement of collective-bargaining contracts" to promote "a higher degree of responsibility upon the parties to such agreements," *Hines v. Anchor Motor Freight, Inc.,* 424 U.S. at 561–62, 96 S.Ct. at 1054–55 (1976), and that the arbitration means chosen by the parties for settlement of their differences be given "full play." *Id.* (*citing Steelworkers v. American Mfg. Co.,* 363 U.S. 564, 566, 80 S.Ct. 1343, 1345, 4 L.Ed.2d 1403 (1960)). *See also Bell v. IML Freight, Inc.,* 589 F.2d at 506.

The requirement that Graves and Local 961 pursue and complete every possible grievance procedure is in "consonance with the implied covenant in every contract 'that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *United Steelworkers of America*

*v. New Park Mining Co.*, 273 F.2d at 357 (*quoting Local 1912 International Association of Machinists v. United States Potash Co.*, 270 F.2d 496 (10th Cir. 1959). I am impressed by Local 961's argument that had it chose not to resolve this dispute by filing this action but rather chose to strike, under Graves' interpretation of the collective bargaining agreement it too would be without any mechanism to arbitrate the dispute. Therefore, it is my decision that Graves and Local 961 should seek an expeditious resolution of their disputes through the grievance procedure provided for in Article 45 of the Western States Supplement, *i. e.*, an appeal to the Joint Western Area Committee of the deadlocked decision of the Joint State Committee. Although neither this Committee nor any other committee appointed by it may be able to resolve the change of operations proposal through the means contemplated by the parties because of lack of jurisdiction over OPEIU, the committee may resolve whether Graves can be excused from the contractual successorship requirement set out in Article 1, section 3 of the National Masters Freight Agreement or be required to settle or arbitrate the seniority and other contended questions amicably.

In addressing the equitable principles which control my decision to issue this injunction I note that Graves has breached its obligation to arbitrate the disputes arising from its proposed change of operations, that by its indication to transfer and let Garrett "work out" the unit clarification problems with the NLRB it may continue to breach its obligations under the successorship clause of the collective bargaining agreement, and that such activities are very likely to cause irreparable injury to the employees represented by Local 961. *See Boys Markets, Inc. v. Retail Clerks Union, Local 770*, 398 U.S. at 254, 90 S.Ct. at 1594. In weighing the respective injuries to the union and the company, although Graves will be deterred from making a complete transfer and Garrett will be estopped from seeking a unit clarification from the NLRB, Graves has already transferred its physical office operations to the Garrett plant. I find that maintaining the status quo until

the seniority and other employment issues can be resolved through arbitration will not detrimentally affect Graves' business operations. *Id. See also Lundgrin v. Claytor*, 619 F.2d at 63. Therefore, it is

ORDERED that upon the posting of a bond in the amount of One Hundred Dollars ($100.00) by the plaintiff a preliminary injunction shall issue as prayed for.