**RELIABLE COAL CORPORATION,**
Petitioner,

v.

**Rogers C. B. MORTON, Secretary of the Interior and his delegate, and the Board of Mine Operations Appeals of the Department of the Interior, Respondents.**

No. 72-1477.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 8, 1972.

Decided May 3, 1973.

258

Brooks E. Smith, Kingwood, W. Va. (Dailey & Smith, Kingwood, W. Va., on brief), for petitioner.

Michael Kimmel, Atty., U. S. Dept. of Justice, Civil Div. (Harlington Wood, Jr., Asst. Atty. Gen., Alan S. Rosenthal, Atty., U. S. Dept. of Justice, Civil Div., J. Philip Smith, Asst. Sol., U. S. Dept. of Interior, on brief), for respondents.

Charles L. Widman, Atty., International Union, United Mine Workers of America (Edward L. Carey, and Willard P. Owens, Washington, D. C., on brief), for respondent, International Union, United Mine Workers of America.

Before BUTZNER, FIELD and WIDENER, Circuit Judges.

FIELD, Circuit Judge:

█ Reliable Coal Corporation seeks review of a decision of the Board of Mine Operations Appeals which affirmed the Hearing Examiner in denying Reliable's petitions to modify certain mandatory safety standards contained in Sections 303(d)(1) and 303(*l*) of the Federal Coal Mine Health and Safety Act of 1969, 30 U.S.C. §§ 863(d)(1) and 863(*l*). Additionally, petitioner complains of the Board's determination that review of the reasonableness of time for abating a violation of Section 303(d)(1) was rendered moot upon Reliable's compliance with the standard.[1] Jurisdiction for this review is based upon Section 106, 30 U.S.C. § 816.

Under Section 301(c) of the Act, 30 U.S.C. § 861(c), the Secretary may, upon petition by an operator or the representative of miners, modify the application of any mandatory safety standard to a mine if he determines that "an alternative method of achieving the result of such standard exists which will at all times guarantee no less than the same measure of protection afforded * * * by such standard" or that "the application of such standard to such mine will result in a diminution of safety to the miners."

Asserting that its Kanes Creek Mine was entitled to modification of the mandatory standards of Section 303(*l*) under both criteria of Section 301(c), Reliable filed its initial petition for modification on January 5, 1971. On January 7, 1971, a preshift inspection resulted in the issuance of an abatement order for violating Section 303(d)(1) of the Act to take effect January 22, 1971.[2] Subsequent to this order Reliable filed separate petitions challenging the reasonableness of time of the order as well as the application of Section 303(d)(1) on

---

1. We agree with the Board's ruling on this point and do not feel the question necessitates further discussion.

2. As a result of petitioner's purchase order for methane detectors the period of abatement was extended several times until June 14, 1971. On that date, the Bureau of Mines issued a notice of abatement since the detectors had then been procured by Reliable.

the basis that it was in compliance with the standard by an alternative method that attains the same result and assures no less than the same measure of protection to the miners. These petitions were consolidated for hearing by the Examiner.

In both instances, the modifications sought by Reliable pertain to testing devices used to detect methane in a mine. Section 303(d)(1) requires the use of a methane detector [3] to check for accumulations of methane within three hours immediately preceding the beginning of the shift. In lieu of the detector, Reliable would test with a permissible flame safety lamp, a device commonly used for this purpose prior to the 1969 Act.[4] Section 303(l) requires as an additional methane detecting device that a methane monitor[5] be installed on any electric face cutting equipment, continuous miner, longwall face equipment, and loading machine, except that no monitor is required to be installed on the equipment prior to the date such equipment is required to be permissible [6] under Section

305(a), 30 U.S.C. § 865(a).[7] Reliable seeks to avoid the mandate of this provision of the Act by making what it terms "continuous routine periodic checks" with a methane detector or permissible flame safety lamp. The Examiner, whose decision was affirmed by the Board, concluded that neither of the modifications proposed by Reliable would meet the requirements of Section 301(c) that they guarantee the same measure of protection to the miners as the mandatory standards. In reaching this conclusion, the Examiner rejected Reliable's argument that he should determine whether the Kanes Creek Mine is not gassy or potentially gassy. While permitting evidence on this question at the hearing, he concluded that the Act abolished the gassy/nongassy distinction and therefore it was unnecessary for him to make a factual finding relative to the potential for methane accumulations in Reliable's Kanes Creek Mine.

Reliable's position on this review rests on the premise that Sections 301(c) and 305(a) of the 1969 Act, when read to-

3. The methane detector is a small portable instrument about the size of a transistor radio which measures the concentration of methane in the sampled air.

4. Section 303(d)(1) requires testing for methane "[with] means approved by the Secretary." This provision was implemented by regulation, 30 C.F.R. 75.304–3, which permitted the use of the flame safety lamp until December 31, 1970, on and after which date a methane detector was required; however, the flame safety lamp may still be used as a supplementary testing device. The express language of the statute rejecting the use of the flame safety lamp, coupled with protests in subcommittee hearings against the rejection of the lamp as an adequate testing device, indicates a Congressional determination that the flame safety lamp, when used exclusively, is inadequate for the purpose of testing for methane. See Hearings on H.R. 4047, H.R. 4295 and H.R. 7976, before a Subcommittee of the House Committee on Education and Labor, 91st Cong. 1st Sess. 138–39 (1969).

5. The methane monitor is similar to the methane detector, except that it tests on a continuous basis rather than at periodic intervals, and is designed to be attached

to electrically powered mine machinery. Section 303(l) requires that the monitor be set to automatically give a warning when the methane concentration reaches one percent, and to automaticaly de-energize the machinery when the methane concentration reaches two percent.

6. As applied to electric face equipment, "permissible" means "the electric parts of which * * * are designed, constructed, and installed, in accordance with the specifications of the Secretary, to assure that such equipment will not cause a mine explosion or mine fire, and the other features of which are designed and constructed, in accordance with the specifications of the Secretary, to prevent, to the greatest extent possible, other accidents in the use of such equipment * * *." Section 318(i) of the Act, 30 U.S.C. § 878(i).

7. Section 305(a) which will be discussed in detail infra, authorizes grace periods for certain mines to comply with the mandatory standards as related to permissible equipment. With respect to the Kanes Creek Mine, the required date for installation of the methane monitors will be March 30, 1974.

gether, indicate that it retained the distinction of the 1952 Federal Coal Mine Safety Act between gassy and nongassy mines. Under the prior Act, a nongassy mine, a classification based on the amount of methane detected in a mine, was subject to less stringent safety standards than those imposed on a gassy mine. *See, e. g.*, Sections 209(d)(5), (6), (7), (9), (10), and (11) of the 1952 Act, 66 Stat. 703. Reliable concedes that all mines are initially regulated by the same standards under the 1969 Act, but argues that the debate in Congress on the question of retaining the distinction resulted in a compromise provision, namely Section 301(c), which they feel permits an operator to obtain a modification upon a factual showing that there is no potential for gas accumulation in the operator's mine. Reliable reasons that once this is established, the mine satisfies the criteria for modification as enunciated in Section 301(c). They contend that Section 301(c) does not require a finding that the alternative method of measuring methane proposed by the operator must have the same degree of refined measurement as the statutory standard, but only that it achieve the same result. From this premise Reliable argues that since no methane exists in the Kanes Creek Mine, the alternative method will guarantee no less than the same protection since the result of using either device will be the same —a zero reading of methane. Reliable also refers to Section 305(a)(2) as an indication of Congressional intent to retain the gassy/nongassy distinction since this section extends to mines not previously classified as gassy and located above the watertable substantial grace periods within which to convert their present equipment to permissible status. Under the 1952 Act, it was primarily in regard to the requirement pertaining to the use of permissible electrical equipment that the distinction between gassy and nongassy mines was significant. In sum, based on a showing that the Kanes Creek Mine is not gassy or potentially gassy, Reliable asserts that Section 301(c) should countenance the use of a permissible flame safety lamp in lieu of a methane detector; and either of these devices in lieu of the methane monitor.

■ The argument is flawed in every aspect, the most conspicuous being the contention that the 1969 Act retained the distinction between gassy and nongassy mines. A review of the legislative history of the Act as contained in House Comm. on Ed. and Labor, Legislative History Federal Coal Mine Health and Safety Act, Comm.Print, 91st Cong., 2d Sess. (1970) [hereinafter cited as *Leg. Hist.*], convinces us that, aside from the extension periods provided for in the Act, Congress intended to eliminate any distinction between gassy and nongassy mines. While the debate in Congress relative to Section 305(a) focused on the requirement of maintaining permissible equipment, it clearly indicates a rejection of the classification as related to all safety standards since obviously the means prescribed to detect methane provides greater protection for the miners than the mere elimination of one source of igniting the gas once its presence is discovered in a working area.

As in the case of prior coal mine legislation, the 1969 Act was precipitated by a tragic mining incident, an explosion which entombed seventy-eight coal miners in the Farmington No. 9 mine located in West Virginia.[8] *Leg.Hist.* at 558. Immediately, Senate and House Subcommittees conducted extensive hearings to propose new legislation designed to raise the health and safety standards of the coal mining industry and one of the major areas of concern and controversy involved the elimination of the gassy/nongassy distinction. Aside from the dust standard, no issue received as much time or attention before the Senate Subcommittee. *Leg.Hist.* at 222. Significantly, of the bills introduced in the Senate Hearings on S. 355, S. 467, S.

---

8. The mine was sealed ten days after the explosion and its cause remains unknown.

1094, S. 1178, S. 1300, and S. 1907 Before a Subcommittee of the Comm. on Labor and Public Welfare, 91st Cong. 1st. Sess. 7–447 (1969), only Senator Cook's proposal retained the distinction, *id.* at 283. The Committee, which during the deliberations had rejected an amendment submitted by Senator Cooper which would have retained the gassy/nongassy classification, *Leg.Hist.* at 35, explained in their report accompanying the composite bill S. 2917, that "[they] followed the recommendation of the Department of Interior that all mines be treated alike, in providing these new and additional safeguards to control methane and prevent ignitions." *Leg.Hist.* at 27.

During the Senate debate on the Committee Bill, Senator Cooper again introduced an amendment to retain the distinction. *Leg.Hist.* at 397. To accommodate the Senator's views with respect to the financial imposition on the small mines, the substitute amendment was offered which provided mines previously classified as nongassy additional time within which to comply with the requirements of procuring permissible electrical equipment. *Leg.Hist.* at 474–77. The amendment recognized the economic impact on the small operator if required to convert to permissible equipment on the operative date of the Act, as well as the industrial reality that manufacturers were incapable of producing the requisite equipment within a relatively short period of time. It is manifestly clear that Section 305(a) was a compromise measure incident to the elimination of the prior classification, *Leg.Hist.* at 690, 742. During the debate Senator Cooper himself recognized that except for the extension periods the adoption of the substitute amendment would remove the gassy/nongassy classification, *Leg.Hist.* at 481. The substitute amendment was passed and contained in the final Senate Bill, *Leg.Hist.* at 482, 530.

The House likewise rejected the proposals of the small mine operators urging the retention of the distinction.

The House Committee, after extensive hearings on the issue, Hearings on H.R. 4047, H.R. 4295, and H.R. 7976 Before the Comm. on Ed. and Labor, 91st Cong., 1st Sess. (1969), submitted a bill, H.R. 13950, which contained provisions similar to the Senate Bill regarding the elimination of the distinction, but did provide an extended grace period for compliance. While the Bill was on the House floor members of the House were advised that acceptance of the proposed Bill contemplated the elimination of the gassy/nongassy classification. *Leg.Hist.* at 690. The statement of the Managers of the House relative to the Bill accepted in conference explained that Section 305(a) which eliminated the distinction adopted the language of the Senate Bill, but accepted the time provisions of the House Bill. *Leg.Hist.* at 1045. In the Senate debate on the conference Bill, Senator Williams submitted a summary of the major provisions of the Bill in which he unequivocally stated that "[305(a)] eliminates the distinction between gassy mines and the so-called non-gassy mines." *Leg.Hist.* at 1130.

The history of the Act demonstrates beyond any doubt that Congress carefully evaluated the issue and determined that the gassy/nongassy distinction should be eliminated. Yet, Reliable contends that Section 301(c), which was not contained in the Senate Bill, but was placed in the House Bill and conference Bill, was a compromise provision which in effect affords the small mine operator the statutory means to perpetuate the distinction. Again the legislative history as well as the plain language of the Act refutes this contention. Under the statutory pattern the Secretary is directed to "develop, promulgate and revise, as may be appropriate, improved mandatory safety standards for the protection of life and the prevention of injuries in a coal mine * * *." This authority and the procedure incident thereto is delineated in Section 101 of the Act, 30 U.S.C. § 811. However, recognizing the urgent need for improved safety measures, interim mandatory

safety standards applicable to all underground coal mines are prescribed by Sections 302 through 318 of Title III of the Act, 30 U.S.C. §§ 862–878. These provisions were designed to prescribe immediate mandatory standards without undergoing the 'lengthy administrative process for the promulgation of such standards by the Secretary under Section 101, Leg.Hist. at 50. The expeditious application of these standards to the entire coal mining industry necessarily presented a variety of problems, technical in nature, and it was necessary to give the Secretary a degree of flexibility to adjust the many detailed requirements of Title III to the particular problems of individual coal mines. This is the plain purpose of Section 301(c), but it was never intended by the Congress that modifications thereunder would be employed to dilute the statutory standards or resurrect the "gassy/nongassy" distinction.

 The safety standards embodied in Title III of the Act represent an attempt by the Congress to maximize the protection of the miners based on the current knowledge and technology of the industry. These standards, however, are not to be static, but constantly upgraded to provide increased safety and, when necessary, to meet changes in technology and mining conditions. Leg.Hist. at 1040. The methane testing devices challenged by Reliable were designed by the Act to provide reasonable interim protection for the miners and assuredly it would frustrate the legislative purpose to construe Section 301(c) in a manner which would permit these standards to be lowered.[9]

In St. Marys Sewer P. Co. v. Director of U. S. Bureau of Mines, 262 F.2d 378, 381 (3 Cir. 1959), which involved an in-

terpretation of the 1952 Act, the Court stated:

"The statute we are called upon to interpret is the out-growth of a long history of major disasters in coal mines. * * * It is so obvious as to be beyond dispute that in construing safety or remedial legislation narrow or limited construction is to be eschewed. Rather, in this field liberal construction in light of the prime purpose of the legislation is to be employed."

We find this observation equally appropriate to the case at hand and conclude that the Board's interpretation of the Act carries out the plain intent of the Congress and should not be disturbed.

The order of the Board will be affirmed.

Affirmed.

---

9. Recognition of the interim standards as the minimal protective measures acceptable to Congress is evident in the language of Section 101(b), 30 U.S.C. § 811(b) :

"No improved mandatory health or safe-mandatory health or safety standard."

ty standard promulgated under this subchapter shall reduce the protection afforded miners below that provided by any