**FREEMAN COAL MINING COMPANY, a Division of Material Service Corporation, Petitioner,**

v.

**INTERIOR BOARD OF MINE OPERATIONS APPEALS et al., Respondents.**

No. 73–1909.

United States Court of Appeals, Seventh Circuit.

Argued May 31, 1974.

Decided Oct. 22, 1974.

742

———◆———

Harry M. Coven, Chicago, Ill., for petitioner.

J. Philip Smith, Asst. Sol., U. S. Dept. of the Interior, Washington, D. C., Morton Hollander and Michael Kimmel, (argued) Dept. of Justice, App. Section (Civ.Div.), Washington, D. C., for respondents.

Before PELL, STEVENS and SPRECHER, Circuit Judges.

PELL, Circuit Judge.

The petitioner Freeman Coal Mining Company (Freeman) brought this action seeking review of a decision of the Secretary of the Interior, acting by the Interior Board of Mine Operations Appeals (the Board). In its decision, the Board upheld the validity of an order requiring the withdrawal of all persons from one of the petitioner's coal mines until an allegedly unsafe condition was abated.[1] The withdrawal order was based upon a finding by a federal mine inspector that an accumulation of float coal dust in the mine constituted an "imminent danger" within the meaning of the Federal Coal Mine Health and Safety Act of 1969, 30 U.S.C. § 801 et

1. The Board's decision is reported at 2 I.B. M.A. 197 (1973). The Board's decision be-came the final action of the Secretary. 43 C.F.R. §§ 4.1(4) and 4.500(a)(1) (1973).

seq. After a hearing, an administrative law judge vacated the imminent danger withdrawal order and converted the order into a notice of violation pursuant to 30 U.S.C. § 814(a). The Board reversed the administrative law judge and Freeman now petitions for review of the Board's decision.[2]

Essentially two issues have been raised by Freeman: (1) whether the Board correctly interpreted the term "imminent danger" as used in 30 U.S.C. § 814(a); and (2) whether, given the proper interpretation of "imminent danger," there was substantial evidence to support the Secretary's finding that an imminent danger existed in the petitioner's mine.

## Mootness

■ We turn first, however, to the preliminary question of whether this case is moot. The possibility of mootness is suggested by the fact that the withdrawal order was effective for only 26 hours and terminated in March 1972.

We note, however, that the withdrawal order may have an effect on other proceedings. Under the Act, the Secretary can assess civil penalties against the operator of a coal mine in which a violation of a mandatory health or safety standard occurred. 30 U.S.C. § 819. In determining the amount of the penalty, the Secretary considers, *inter alia*, the "gravity of the violation." 30 U.S.C. § 819(a). And, as the Fourth Circuit has noted, "[t]he issuance of a withdrawal order is a factor bearing upon the gravity of a violation, and its validity or the correctness of the factual basis on which it rests may not be relitigated in a [civil penalty] proceeding." Eastern Assoc. Coal Corp. v. Interior Bd. of Mine Operations Appeals, 491 F.2d 277, 278 (4th Cir. 1974). Under these circumstances, the present case is not moot. *Id.*

## Imminent Danger

The Act provides that where a federal mine inspector finds that an imminent danger exists in a coal mine, he will order the withdrawal of all persons from a part or all of that mine until the imminent danger is no longer present. 30 U.S.C. § 814(a).[3] The term "imminent danger" is defined in the Act as:

"the existence of any condition or practice in a coal mine which could reasonably be expected to cause death or serious physical harm before such condition or practice can be abated . . . ." 30 U.S.C. § 802(j).

The Board, in its decision, stated that "imminent danger," as used in the Act, relates to "the proximity of the peril to life and limb." 2 I.B.M.A. at 212. Specifically, the Board phrased the test for an imminent danger as:

"[W]ould a reasonable man, given a qualified inspector's education and experience, conclude that the facts indicate an impending accident or disaster, threatening to kill or to cause serious physical harm, likely to occur *at any moment, but not necessarily immediately?* The uncertainty must be of a nature that would induce a reasonable man to estimate that, if normal operations designed to extract coal in the disputed area proceeded, it is at least just as probable as not that the feared accident or disaster would occur before elimination of the danger." *Id.* (Emphasis added.)

Freeman contends that the Board misinterpreted the term "imminent danger." According to Freeman, "imminent danger" applies only to "extreme and un-

---

2. Review by this court is pursuant to 30 U.S.C. § 816(a).

3. 30 U.S.C. § 814(a) provides: "If, upon any inspection of a coal mine, an authorized representative of the Secretary finds that an imminent danger exists, such representative shall determine the area throughout which such danger exists, and thereupon shall issue forthwith an order requiring the operator of the mine or his agent to cause immediately all persons, except those referred to in subsection (d) of this section, to be withdrawn from, and to be prohibited from entering, such area until an authorized representative of the Secretary determines that such imminent danger no longer exists."

usual situations where the conditions are such that a danger exists which has *an immediate threat* to cause injury or death," where "a catastrophe [is] near or present." (Emphasis added.)

A review of the purpose, the legislative history, and the wording of the Act convinces us that the Board correctly interpreted the term "imminent danger."

In enacting the Federal Coal Mine and Safety Act of 1969, the primary concern of Congress was with the health and safety of the miners, the "most precious resource" of the coal mining industry. 30 U.S.C. § 801. Thus, the House Report states:

> "It is the purpose of the bill . . . to protect the health and safety of coal miners, and to combat the steady toll of life, limb, and lung, which terrorizes so many unfortunate families." H.R.No.91–563, 91st Cong., 1st Sess., 2 U.S.Code Cong. & Admin. News, p. 2503 (1969).

■ More specifically, the provision of the Act dealing with withdrawal for imminent danger was clearly intended to assure the miners would not carry on routine mining operations in the face of imminent dangers.[4] With respect to what constitutes an "imminent danger," it was stated:

> "The definition of an 'imminent danger' is broadened from that in the 1952 act in recognition of the need to be concerned with any condition or

practice, naturally or otherwise caused, which *may* lead to sudden death or injury before the danger can be abated. It is not limited to just disastrous type accidents, as in the past, but all accidents which could be fatal or nonfatal to one or more persons before abatement of the condition or practice can be achieved." 115 Cong. Rec. 39985 (1969). (Emphasis added.)[5]

■ Since the Act in question is a remedial and safety statute, with its primary concern being the preservation of human life, it is the type of enactment as to which a "narrow or limited construction is to be eschewed." St. Marys Sewer Pipe Co. v. Director of United States Bureau of Mines, 262 F.2d 378, 381 (3d Cir. 1959). Rather, this court must interpret the Act liberally in light of its primary purpose. *St. Marys, supra*; Reliable Coal Corp. v. Morton, 478 F.2d 257, 262 (4th Cir. 1973).[6] To limit, as Freeman would have us, "imminent danger" to immediate danger would result, in many cases, in gambling with human lives. Such a result is clearly inconsistent with the humane purposes of the Act.

■ The language of the Act also supports the Board's interpretation. The Act calls for the "immediate" withdrawal of all persons when an "imminent" danger is found to exist. Only the withdrawal action is phrased in terms of "immediate." This is entirely reason-

---

4. "[Section 814(a)] provides that if an inspector finds the existence of an imminent danger in any mine . . . he must immediately issue a withdrawal order to the operator requiring him to withdraw the men from the mine or area thereof affected and prevent entrance by anyone to that mine or area, except those miners necessary to abate the hazard. Withdrawal must be to a safe area. The order remains in effect until an inspector determines that there is no danger. The imminent danger may be due to a violation of a mandatory safety standard or some other cause not covered by a standard, including natural causes. It should be emphasized at this point that the operator has a duty under the Act to withdraw persons from a mine or area thereof affected by an imminent danger without waiting for an in-

spector to order it." 115 Cong.Rec. 39986 (1969).

5. Under the 1952 Federal Coal Mine Safety Act, a federal mine inspector was required to issue a withdrawal order if he found "danger that a mine explosion, mine fire, mine inundation, or man-trap or man-hoist accident will occur in such mine immediately or before the imminence of such danger can be eliminated." 66 Stat. 692, 694.

6. "[T]he overall objective of the Act is to eliminate unsafe and unhealthful conditions and practices and to provide benefits for miners and dependents afflicted by occupationally caused respiratory disease and, in accomplishing this objective, *it is the intention of the conferees that it be construed liberally.*" 115 Cong.Rec. 39985 (1969). (Emphasis added.)

able since if withdrawal could not be ordered unless the danger was also "immediate," the expected accident would, likely as not, occur during the withdrawal, thereby injuring miners. Moreover, under § 814(d), persons necessary to eliminate the danger are permitted to remain in the area for that purpose. It is questionable whether anyone would remain in a mine for any purpose if there was an "immediate" or "catastrophic" danger. A reading of the entire section, in light of the Act's humane purpose, makes clear that the Board has correctly construed "imminent danger" as being a situation in which a reasonable man would estimate that, if normal operations designed to extract coal in the disputed area should proceed, it is at least just as probable as not that the feared accident or disaster would occur before elimination of the danger.[7]

We note, moreover, that the Fourth Circuit has recently accepted the Board's interpretation of "imminent danger." Eastern Assoc. Coal Corp. v. Interior Bd. of Mine Operations Appeals, *supra*, 491 F.2d at 278.[8]

This court has recently had occasion in an entirely different context, one in which there was no statutory definition of "imminent," to observe that the word has been the subject of considerable judicial attention. Definitions have been of the tenor of something threatening to happen at once or on the point of happening. Continental Illinois National Bank and Trust Company v. United States, 504 F.2d 586, at 591 (7th Cir. 1974).

In the present context, it often will only be the fact of the hindsight of a devastating explosion which will prove conclusively that the danger was on the point of happening.

Finally, it is not at all clear that the opposing parties here are not in reality talking about the same thing but with different semantical approaches. An imminent threat is one which does not necessarily come to fruition but the reasonable likelihood that it may, particularly when the result could well be disastrous, is sufficient to make the impending threat virtually an immediate one.

*Sufficiency of the Evidence*

■■ The remaining issue is whether the Board correctly determined that the conditions in the petitioner's mine, at the time the withdrawal order was issued, constituted an imminent danger to the safety of the miners. This court must, of course, affirm the Secretary's decision if it is supported by substantial evidence. 30 U.S.C. § 816(b). In making our determination, we must appraise the evidence in light of the entire record, taking into account the contrary report of the administrative law judge. Universal Camera Corp. v. NLRB, 340 U.S. 474, 493–497, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

The record establishes the following facts concerning float coal dust. Float

---

7. Freeman argues that the Board's construction of "imminent danger" expands § 814(a) to cover situations covered by §§ 814(b) and (c). We find this contention unpersuasive. Sections 814(b) and (c) govern issuances of notices of violation and subsequent withdrawal orders in the event of a failure to abate where there has been a violation of a mandatory health or safety standard. Section 814(a), on the other hand, is not limited to situations where a violation of a safety standard has occurred but, rather, is designed to protect the miners from any condition or practice which is likely to cause death or serious physical harm before the condition or practice can be abated, regardless of whether a violation of a safety standard is involved. Moreover, the issuance of a notice under § 814(b) or § 814

(c) does not always require the withdrawal of miners. The issuance of a notice of violation under one of these two sections, therefore, would not necessarily protect the miners in situations where, if normal procedures are continued, the accident might occur before the danger can be abated.

8. The Fourth Circuit stated:
"The Secretary determined, and we think correctly, that 'an imminent danger exists when the condition or practice observed could reasonably be expected to cause death or serious physical harm to a miner if *normal mining operations were permitted to proceed in the area before the dangerous condition is eliminated.*'" 491 F.2d at 278. (Court's own emphasis.)

coal dust consists, generally, of small particles of coal dust which can be suspended in air.[9] When float coal dust is suspended in air, it is highly explosive upon ignition. Moreover, once float coal dust has been ignited, the ignition itself will kick more dust into the air and further ignite it. The ignition process will proceed along the area containing the float coal dust and ignite all of it. A common cause of such explosions, according to the mine inspector, is the ignition of methane, an explosive gas.

The evidence indicated that, in the petitioner's mine, float coal dust was present along certain beltways.[10] The area so affected, moreover, was extensive, being approximately 7200 feet in length. At the time the withdrawal order was issued, the mine was in operation with coal passing along the belts.[11] Finally, there was evidence to indicate that the mine had a history of releasing methane gas.

The petitioner contends that these facts are insufficient to support the Board's finding of imminent danger. In particular, Freeman notes that there was neither suspension of the float coal dust in air, nor ignition, nor a concentration of methane gas in the mine at the time the withdrawal order was issued. The petitioner urges that absent such suspension and ignition, a coal dust explosion was not imminent. We find this argument unpersuasive.

The lack of suspension and ignition indicates only that an explosion might not have occurred immediately. The facts in the record fully support the Board's finding that the danger of an explosion was, nonetheless, "imminent." [12] With the mine in operation extracting coal, it was more probable that the float coal dust would be kicked into the air. The mine being in operation [13] also meant that if an explosion did occur, the miners would be exposed to danger. The widespread accumulation of float coal dust was also significant, as the Board noted, since "it substantially multiplies the chances for disturbing the dust and increases the number of miners exposed to the threat of death or injury by a propagated explosion." 2 I.B.M.A. at 213. The extensive nature of the ac-

9. More specifically, "coal dust" is defined as "particles of coal that can pass a No. 20 sieve" while "float coal dust" means "the coal dust consisting of particles of coal that can pass a No. 200 sieve." 30 C.F.R. §§ 75.400–1 (a) and (b) (1973).

10. The federal mine inspector's order of withdrawal stated:
"The main belt from the dump on the bottom to the tailpiece at 1,004 ft. tag North and the main East belt from the No. 1 drive to the No. 7 North, a distance of 4,596 ft. tag, and the No. 7 North belt was very black with float coal dust."
The belts in question were used to convey coal. The coal dust accumulates on the belts and then works itself off and drops onto the floor.

11. When the withdrawal order was issued, mine operations ceased and the 80 men who were working at the time turned their efforts to rock dusting in order to abate the cited condition.

12. The petitioner claims that the Board "arbitrarily" rejected the findings of fact of the administrative law judge. The Board, however, has express authority to modify or set aside a decision of an administrative law judge. 43 C.F.R. § 4.605 (1973). Moreover, in the present case, the Board and the administrative law judge agreed on certain basic facts, namely, that there was float coal dust throughout the affected area and that the area consisted of 7,200 feet. Other findings of fact made by the administrative law judge (e. g., the absence of suspension of the dust and the lack of methane gas in the mine at the time of the withdrawal) were not disputed by the Board but were not considered to be determinative in light of the entire factual situation. Finally, the Board noted that the administrative law judge had failed to consider other facts established by the record, such as, the operation of the mine and the history of gas releases in the mine. The disagreement between the Board and the administrative law judge involved, essentially, not what the basic facts were but what inference was to be drawn from the facts, i. e., whether the conditions were such as to constitute an imminent danger.

13. Freeman argues that the Board's finding that the mine was in operation while correct is insufficient since the Board, because of the imminent danger requirement, should have found that the mine was in operation "extracting coal." Coal in fact was moving along the belts at the time of the inspection and this quibbling argument borders on the frivolous.

cumulation, in addition, would increase the time necessary for abatement.

Moreover, the lack of methane gas in the mine during the time of the inspection is not determinative. The evidence indicated only that the ignition of methane gas is the most common cause of float coal dust explosions, not that it is the only source of an ignition. With the mine in operation, the chance of some ignition was clearly increased. Furthermore, as the Board noted, "the insignificance of the amount of methane which was probably in the air at the time that the withdrawal order was issued . . . is a fact which must be weighed against the history of the mine and its inherently gassy quality." 2 I.B.M.A. at 213.[14]

After reviewing the record as a whole, we conclude that there is substantial evidence to support the Secretary's finding of imminent danger.

Affirmed.

14. Congress eliminated the prior distinction between gassy and nongassy coal mines in enacting the 1969 Act. The Secretary could still consider, however, the known gassy nature of the petitioner's mine in evaluating the danger of the float coal dust accumulation.