## JONES & LAUGHLIN STEEL CORPORATION

v.

## UNITED MINE WORKERS OF AMERICA et al., Appellants.

### No. 74–2046.

United States Court of Appeals, Third Circuit.

Argued April 15, 1975.

Decided July 24, 1975.

As Amended July 24, 1975.

J. Craig Kuhn, Kuhn, Engle, Blair & Stein, Pittsburgh, Pa., for appellants.

Leonard L. Scheinholtz, Henry J. Wallace, Jr., Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for appellee; J. Peter Kelly, Jones & Laughlin Steel Corp., Pittsburgh, Pa., of counsel.

Before SEITZ, Chief Judge, and ROSENN and WEIS, Circuit Judges.

## OPINION OF THE COURT

WEIS, Circuit Judge.

A district court injunction against a work stoppage pending arbitration of a safety dispute is the subject of this appeal. The union asserts that its action in withdrawing workers from certain parts of a mine was authorized by the National Bituminous Coal Wage Agreement. We conclude that the factual background differs from the conditions present in *Gateway Coal Co. v. United Mine Workers*, 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974), and that the employer's contractual undertaking precluded the final relief which it obtained from the district court.

The Mine Safety & Health Committee of United Mine Workers, Local 762, inspected Vesta Mine No. 5 in Mount Scenery, Pennsylvania on July 7, 1974 and determined that an "imminent danger" existed. The union members then refused to enter any part of the mine and the owner, the Jones & Laughlin Steel Company, applied to the United States District Court for the Western District of Pennsylvania for an injunction terminating the work stoppage. On July 10, 1974, after a conference in chambers, the company and union officers prepared a stipulation providing for a resumption of operations in all areas of the mine except those specifically designated in the safety committee reports. At a meeting of the local union that evening, the members present voted not to return to work. On the following day, the district court ordered that picketing be discontinued and the men return to work except in those parts of the mine which had been listed in the safety committee report. That order was not opposed by the union and the miners resumed partial production.

On July 17–18, 1974, a hearing was held on the request for an injunction applicable to the designated parts of the mine. At that time, the union presented evidence that the Committee's action was precipitated by J. & L. Steel's failure to provide canopies for certain mining equipment as specified in the regulations[1] promulgated under the Federal Coal Mine Health and Safety Act of 1969. 30 U.S.C. § 801 *et seq.* The testimony established that the members of the Safety Committee believed that these omissions constituted an imminent danger. The company asserted that the federal mine inspectors had found no imminent danger and that attachment of canopies had been delayed by technical problems of design and manufacture.

The district court ruled that the union had failed to prove by ascertainable, objective evidence the existence of an imminent danger of death or bodily injury from an abnormally dangerous work condition. Accordingly, on July 29, 1974 an injunction was issued which required work to resume in those parts of the mine mentioned in the Safety Committee's report and which had not been subject to the court's order of July 10, 1974. Moreover, the parties were directed to utilize the contractual grievance procedures.

The company and the union were signatories to the National Bituminous Coal Wage Agreement of 1971 which provided, in some detail, for the settlement of disputes through a a grievance procedure involving a form of arbitration as the

---

1. 30 C.F.R. § 75.1710–1(a)(2).

final step. The contract also required the formation at each mine of a safety and health committee whose members were selected by the Union and who were given the right of inspection of the work place.

Article III, Section (g)(1) of the Agreement provided that:

"If the [mine health and safety] committee believes conditions found endanger the lives and bodies of the employees, it shall report its findings and recommendations to the Employer. In those special instances where the committee believes an imminent danger exists and a committee recommends that the Employer remove all employees from the involved area, the Employer is required to follow the recommendation of the committee."

In the event that disputes developed between the Committee and the mine owner, two cumulative remedies were made available:

1. under Article III, Section (g)(3), if the members of the Committee had acted capriciously, they could be removed through the regular grievance procedures;

2. in accordance with Article III, Section (h), differences were to be resolved by utilizing a series of steps ultimately leading to a final decision by the Joint Industry Health and Safety Committee.

In *Gateway Coal Co. v. United Mine Workers, supra,* the Supreme Court held that safety issues were arbitrable under the National Bituminous Coal Wage Agreement of 1968 and that an injunction could be issued requiring the continuance of work while the dispute was processed through the grievance machinery. The Court stated also that when § 502 of the Labor Management Relations Act [2] is relied upon as a basis for denial of injunctive relief "an honest belief, no matter how unjustified, in the existence of 'abnormally dangerous conditions for work' is not sufficient." The opinion noted agreement with Judge Rosenn of this court that "ascertainable objective evidence" is required in such circumstances. It was in reliance upon this language that the district court ordered the Union to end the work stoppage in the areas designated by the Safety Committee's report.

There are, however, three distinctions present here which remove this case from the thrust of *Gateway*:

1. There was objective evidence of the alleged imminently dangerous condition rather than the merely subjective reactions to a co-employee's safety consciousness.

2. The union did not rely solely upon § 502 of the Labor Management Relations Act.

3. The union asserted contractual authority for the action of the Safety Committee in closing down portions of the mine, a point specifically not decided by the *Gateway* court.[3]

The *Gateway* case and the collective bargaining agreement make it clear that the dispute over an imminent danger condition was to be settled by resort to the contractually prescribed procedures. The district court in this instance, however, undertook a factual evaluation and found that no imminent danger existed. We do not understand that the court intended its determination on this point to be final but only to hold that as a preliminary matter the union had not made out a sufficiently strong case to justify a continuation of the partial shutdown. As we read the court's order, the factual issue ultimately was to be resolved by arbitration.

**2.** 29 U.S.C. § 143 reads in part:

"[N]or shall the quitting of labor by an employee or employees in good faith because of abnormally dangerous conditions for work at the place of employment of such employee or employees be deemed a strike under this chapter."

**3.** The pertinent contractual provisions in 1968 and the 1971 agreements are essentially the same, although Article III, Section (h) of the 1971 contract providing for final settlement of safety grievances by a Joint Industry Health and Safety Committee was not in the 1968 version.

*Gateway* expanded the scope of *Boys Market, Inc. v. Retail Clerks Union*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), and held that, if the parties had agreed to arbitrate their differences, a no-strike clause would be implied. However, the Court noted the limits of that doctrine when it said:

"Thus, an arbitration agreement is usually linked with a concurrent no-strike obligation, but the two issues remain analytically distinct. Ultimately, each depends on the intent of the contracting parties. It would be unusual, but certainly permissible, for the parties to agree to a broad mandatory arbitration provision yet expressly negate any implied no-strike obligation. Such a contract would reinstate the situation commonly existing before our decision in *Boys Market*. Absent an explicit expression of such an intention, however, the agreement to arbitrate and the duty not to strike should be construed as having coterminous application." 414 U.S. at 382, 94 S.Ct. at 639.

The contract in this case did contain a specific provision answering the question of whether the miners should continue to work after the Committee had found an imminent danger existed. Article III, Section (g)(1) states unequivocally ". . . the Employer is *required* to follow the recommendation of the committee" to remove all employees from the involved area. (emphasis supplied). Therefore, the employer bound itself by agreement *to stop work* in specified areas deemed unsafe by the committee even though the imminent danger issue could be submitted to arbitration. Where the employer seeks to continue normal operations in areas so designated, we believe that such non-compliance with the terms of the collective bargaining agreement creates an exception to the implied prohibition against work stoppages in the specific and isolated situation involved here.

██ It must be observed that the contractual exception is a limited one. The word "strike" is generally understood to mean a cessation of work by employees, accompanied by picket lines which in combination impair or prevent production in all of the employer's premises. In that sense, the "strike" was ended by the order of July 11, 1974 which the union did not oppose and did not appeal. The subject matter of this case is not a "strike" in its broad connotation but only the removal of employees from a limited portion of the mine while work continued elsewhere. The contractual provision is limited to withdrawal from the "involved area." The agreement does not purport to permit picketing or suspension of labor in the entire mine. Therefore, to the extent that the ban on picketing imposed on July 11, 1974 was reiterated by the order of July 29, 1974, it was correct.

██ The contract did not require objective evidence of imminent danger but authorized the miners' withdrawal in "those special instances where the *committee believes* an imminent danger exists . . ." (emphasis supplied). We need not decide here if an irrational or completely unfounded belief would suffice because the record demonstrates that there was at the least some factual basis for the Committee members' views. The court is not required to determine the correctness of the recommendations; that task is reserved for the grievance procedures. The employer, having bound itself by the contract to accept the Committee's recommendations, was not entitled to relief from its obligation by the court's factual finding which differed from that of the union.

The district court, therefore, erred in its interpretation that the *Gateway* decision authorized a return-to-work order pending the conclusion of arbitration in the circumstances present here. The trial judge was undeniably correct in ordering resort to the grievance procedures under the *Gateway* decision and our later cases of *Island Creek v. United Mine Workers*, 507 F.2d 650 (3d Cir. 1974), and *Automotive Chauffeur Parts and Garage Employees, Local Union No. 926 v. NAPA Pittsburgh*, 502 F.2d 321 (3d Cir.

1974). However, because of the specific terms of the collective bargaining agreement, the injunction, insofar as it applied to the work stoppage in the affected areas of the mine, was improvidently granted and must be vacated.

Because of some lingering disputes between the parties as to good faith participation in the grievance procedures ordered by the district court, the case will be remanded for such further proceedings as may be necessary, costs to abide the event.

ROSENN, Circuit Judge (concurring and dissenting).

I agree with the majority that the factual background of this case differs from that in *Gateway Coal Co. v. UMW*, 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974), and that the instant dispute is arbitrable. I also agree that the district court properly enjoined any coercive tactics by the union other than the withdrawal of employees from portions of the mine designated imminently dangerous by the mine committee. I believe, however, that the employer was not obligated to withdraw employees from the designated areas if it could demonstrate that the committee's recommendations were not made in good faith. Since the record does contain evidence indicating bad faith on the part of the committee, I would remand the case before vacating the injunction.

As the majority correctly observes, Article III, Section (g)(1) requires the employer where the mine committee "believes an imminent danger exists and the committee recommends that the Employer remove all employees from the involved area . . . to follow the recommendation of the committee." I do not agree with the union's suggestion that, under this section, the employer is required to withdraw the employees whenever the mine committee believes an area of the mine to be imminently dangerous. Such an interpretation of the agreement is inconsistent with the national labor policy behind section 301 of promoting a higher degree of respon-

sibility upon the parties to bargaining agreements and thereby promoting industrial peace. *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). The interpretation ignores the "covenant of good faith and fair dealings which must inhere in every collective bargaining agreement if it is to serve its institutional purpose." *United Steelworkers of America v. New Park Mining Co.*, 273 F.2d 352, 356 (10th Cir. 1959). Further, the agreement provides for cumulative remedies if the members of the mine committee have acted capriciously. Implicit in the reservation contained in Article III, Section (g)(3) for the removal of the committee when it acts capriciously is the fundamental principle that the committee must act in good faith.

Thus, I believe that the employer is not required to follow the committee's recommendations if it can demonstrate that the committee acted in bad faith. The majority finds it unnecessary to decide this question "because the record demonstrates that there was at the least some factual basis for the Committee members' views." The support the majority finds in the record apparently is that the lack of canopies violated the mandatory safety standards of the regulations promulgated under the Federal Coal Mine Health and Safety Act.

The problem with this position is that the Act makes a sharp distinction between conditions creating an imminent danger and those conditions violating mandatory safety standards. Imminent danger is defined as "the existence of any condition or practice in a coal mine which could reasonably be expected to cause death or serious physical harm before such condition or practice can be abated." 30 U.S.C. § 802(j) (1970). Section 104(b) of the Act mandates specific procedures to be followed for the abatement of conditions violating a mandatory safety standard but not creating an imminent danger. 30 U.S.C. § 814(b) (1970); *see Freeman Coal Mining Co. v. Interior Bd. of Mine Operation Appeals*, 504 F.2d 741, 745 n. 7 (7th Cir. 1974).

Since the 1971 agreement apparently adopted the Act's standard of imminent danger,[1] I do not believe that a violation of a mandatory safety standard is any evidence of the existence of imminent danger; it is the nature of the violation that is essential.

The district court made no findings concerning the presence of good faith. As an appellate court, we may not make such findings, particularly when the record contains substantial evidence of bad faith.

The committee's recommendation apparently was based on the conclusion that since federal regulations require canopies, the lack of canopies in Vesta Mine No. 5 constituted an imminent danger. All the federal mine inspectors who examined the mine, however, found that the lack of canopies did not constitute an imminent danger. These inspectors were charged with the mandatory statutory duty to issue a notice to the employer to withdraw the employees from areas of the mine found to be imminently dangerous. 30 U.S.C. § 814(a) (1970). The union failed to appeal this determination by the inspectors despite its right to do so. *See* 30 U.S.C. § 815(a)(1) (1970).

Moreover, the *union's* district mine inspector testified that only the Vesta Mine No. 5 had been designated by a mine safety committee as constituting an imminent danger, although to the best of his knowledge only two of the "few hundred" mines within his district completely were equipped with canopies for all electric face equipment. In addition, the company's Assistant Manager of Mine Operations testified without contradiction that the International Union's Mine Inspector had told him "that the safety committee was wrong in shutting down the section."

Finally, the federal regulations became effective on January 1, 1974. The mine committee did not make its recommendation until July. The majority of the employees in the face area are not required by law to work under canopies. The committee did not find that these employees are subject to imminent danger.

Since I believe that the employer would have been entitled to an injunction ordering the employees back to work in areas of the mine found by the committee to be imminently dangerous if that finding had been made in bad faith, and since I do not believe the record conclusively demonstrates the absence of bad faith, I would remand the case for further factual determination before vacating that part of the injunction.

---

1. Section (e) of the 1968 agreement, predecessor to and substantially identical to Article III, Section (g), contained the phrase "immediate danger." After the passage of the Act, the phrase was changed to "imminent danger."