**IRVINGTON MOORE, DIVISION OF U. S. NATURAL RESOURCES, INC., Petitioner,**

v.

**The OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION and F. Ray Marshall, Secretary of Labor, Respondents.**

**GEM TOP MANUFACTURING, INC., Petitioner,**

v.

**The OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION and F. Ray Marshall, Secretary of Labor, Respondents.**

Nos. 75–2159 and 75–2160.

United States Court of Appeals, Ninth Circuit.

June 20, 1977.

Rehearing Denied Sept. 9, 1977.

James B. Ruyle, Sabin, Newcomb, Sabin & Meyer, Portland, Or., argued for petitioner.

Jeffrey L. Berger, Atty., William S. McLaughlin, Executive Secretary Occupational Safety & HRC, Washington, D. C., argued for respondents.

Before LUMBARD *, WRIGHT and ANDERSON, Circuit Judges.

* Senior Circuit Judge for the Second Circuit.

1. The press brakes violations were alleged to be "serious." As defined in 29 U.S.C. § 666(j), a "serious" violation is one which creates a

LUMBARD, Circuit Judge:

Gem Top Manufacturing, Inc. and Irvington Moore, Division of U.S. Natural Resources, petition for review under 29 U.S.C. § 660 of decisions by the Occupational Safety and Health Review Commission holding that they have been violating 29 C.F.R. § 1910.212(a)(3)(ii) by failing to provide point-of-operation guarding on press brakes operated in their plants. Petitioners' principal contention is that press brakes are exempt from the general safety standards of .212(a)(3) by virtue of their explicit exclusion from more detailed requirements for power presses provided in 29 C.F.R. § 1910.-217. We think the Commission's interpretation of the regulations is the more reasonable, and we affirm the decisions.

Gem Top produces metal truck canopies at a plant in Clackamus, Oregon, where it employs 160 workers and grosses about $5 million per year. Irvington Moore makes sawmill equipment at a plant in Tigard, Oregon, where it employs 190 workers and grosses over $6 million per year. A press brake is a machine that bends and shapes pieces of metal which are placed between its two dies. Gem Top has two press brakes at its plant, and Irvington Moore has one.

After routine plant inspections by Occupational Safety and Health Administration compliance officers in March 1973, Gem Top and Irvington Moore were cited under 29 C.F.R. § 1910.212(a)(3)(ii) for failing to guard their press brakes.[1] This regulation provides that:

The point of operation of machines whose operation exposes an employee to injury, shall be guarded. The guarding device shall be in conformity with any appropriate standards therefor, or, in the absence of applicable specific standards, shall be so designed and constructed as to prevent the operator from having any part of his body in the danger zone during the operating cycle.

Subsection .212(a)(3)(iv) provides a list of machines which "usually require point of

"substantial probability that death or serious physical harm could result."

Gem Top and Irvington Moore were also cited for other alleged violations which are not at issue here.

operation guarding"; included in this list is "power presses"—of which press brakes are one type.

· Point-of-operation guarding is also required under 29 C.F.R. § 1910.217, which sets forth a number of detailed safety standards for "mechanical power presses." However, subsection .217(a)(5) provides that press brakes (and several other types of power presses) are "excluded from the requirements of this section." Gem Top and Irvington Moore interpreted this as an exemption of press brakes from any point-of-operation guarding requirement whatsoever.

At hearings before separate administrative law judges, employees at each plant and OSHA personnel testified regarding the operation of the press brakes. At both plants the pieces of metal are hand-fed into the pressing dies—the "point of operation" —of the press brakes. At Gem Top, this customarily brings the operators' hands to within 1½ to 3 inches of the point of operation. The dies, which close with a force of 90 tons per square inch, have amputated the fingers of Gem-Top workers on at least two occasions.

At Irvington Moore, the press brake was used mostly for bending large aluminum panels; during activation of the machine the panel would normally be held at either end by two employees whose hands would be over two feet from the point of operation. One day a month, the press brake was used for punching and channeling operations on smaller metal pieces, which would bring the operators' hands within 3 inches of the dies. There was no testimony of any accidents on the Irvington Moore press brake. At both plants the press brakes were operated by a foot pedal, which was covered in order to avoid accidental triggering; by lifting his foot off the pedal, the operating employee could stop the closing of the dies almost instantaneously. Nevertheless, there was substantial evidence that both plants' press brakes exposed employees to injury. In both plants it was possible for employees to activate the machines while their hands were between the dies, and there was also nothing to ensure against employees reaching back in between closing dies in order to make last-minute adjustments of the material about to be pressed.[2]

At each hearing, an expert witness for the government described a number of different ways in which points of operation of press brakes can be guarded. The uncontroverted testimony was that some of these mechanisms could be used on the press brakes in this case.[3] There was no evidence that Gem Top and Irvington Moore had attempted to guard the points of operation of their press brakes or had supplied their employees with hand tools which would lessen the chances of an accident.[4]

2. Even with respect to the Irvington Moore operations involving large panels held by two employees (of which an illustrative photograph has been submitted), it was possible that either employee might carelessly place a hand in the point of operation.

3. A number of devices were described: permanent physical barriers, barriers that descend or slide into place when the press is activated, photoelectric-eye or electromagnetic-field devices which set up an invisible barrier next to the press and prevent the press from closing so long as the barrier is penetrated by the operator's arm, restraints on the operator's hands which keep him permanently away from the dies, pull-back restraints which pull the operator's hands away from the closing dies, two-hand trip controls which require the operator to use both hands to activate the press, and a radio-activity sensor device which stops the press whenever a radio-active wrist-strap worn by the employee comes close to the dies. Not all of these devices can be used on all operations on all press brakes, but the petitioners made no showing to rebut the expert witnesses' contentions that several of these devices could be accommodated to their operations. For example, it appears that a descending shield, a photoelectric device, or two-hand trips could be used on Irvington Moore's punching and channeling operations, that a permanent wrist restraint could be used on Irvington Moore's aluminum panel operation, and that a photoelectric device, a pull-out wrist restraint, and perhaps a descending shield could be used on Gem Top's operations.

4. Even though 29 C.F.R. § 1910.212(a)(3)(iii) provides that hand tools are required *in addition to* point-of-operation guarding under .212(a)(3)(ii), the Commission has held that an employer who is unable to comply with the point-of-operation guarding requirement

The administrative law judges in the two cases reached opposite conclusions regarding the applicability of 1910.212(a)(3) to press brakes, and the Commission granted review. By a two-to-one vote, the Commission found a violation in each case, reasoning that .217(a)(5) excludes press brakes only from the coverage of section .217, and not from .212(a)(3), which, by its terms, clearly applies to "power presses." See 3 O.S.H.C. 1018 (1975); 3 O.S.H.C. 1022 (1975). A civil penalty of $600 was imposed on Gem Top, and $350 was assessed against Irvington Moore.

## DISCUSSION

Under section 6(a) of the Occupational Safety and Health Act of 1970, 29 U.S.C. § 655(a), the Secretary of Labor was required to promulgate regulations incorporating "any national consensus standard, and any established Federal standard, unless he determined that the promulgation of such a standard would not result in improved safety or health for specifically designated employees."[5] In the event of conflict among any such standards, the Secretary was required to promulgate the standard "which assures the greatest protection" for the employees. Id. The purpose of this rulemaking-by-reference approach was to establish national safety standards "as rapidly as possible"; time-consuming rulemaking procedures were dispensed with on the theory that the consensus standards and the federal standards would already have been subjected to substantial public scrutiny and comment by the parties concerned. See S.Rep.No.1282, 91st Cong., 2d Sess., at 1970 U.S.Code Cong. & Adm.News p. 5182. See generally *Associated Industries v. United States Dept. of Labor,* 487 F.2d 342, 345 (2d Cir. 1973).

The two guidelines at issue in this case come from different sources. See 29 C.F.R. § 1910.22. The precursor of 29 C.F.R. § 1910.212 was a regulation promulgated by the Secretary of Labor in 1969 under the Walsh-Healey Public Contracts Act, 41 U.S.C. §§ 35(e), 38. On the other hand, 29 C.F.R. § 1910.217 was derived from consensus standards devised in 1971 by the American National Standards Institute ("ANSI"), a private organization made up of industry representatives and some representatives of labor and government.[6]

Since in this case the Secretary's interpretation of his own regulations has been affirmed by the Commission, this interpretation must be accorded substantial weight. *Budd Co. v. OSHRC,* 513 F.2d 201, 204–05 (3d Cir. 1975); see *California Stevedore & Ballast Co. v. OSHRC,* 517 F.2d 986, 988 (9th Cir. 1975); *Brennan v. OSHRC,* 513 F.2d 553, 554 (10th Cir. 1975); *Brennan v. Southern Contractors Service,* 492 F.2d 498, 501 (5th Cir. 1974); cf. *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *United States v. Whelan,* 463 F.2d 1093, 1094 (9th Cir. 1972). See also *Brennan v. OSHRC,* 513 F.2d 713 (8th Cir. 1975). Court review here serves only to ensure against circumvention of the public rulemaking process or punishment of em-

may be excused if he has provided adequate hand tools. Diebold, Inc., 1975–76 CCH O.S.H. Dec. ¶ 20,333, at 24,250 (Jan. 22, 1976), appeal filed, No. 76–1278 (6th Cir. March 8, 1976).

5. A "national consensus standard" is defined as one which has been promulgated by a nationally recognized standards-producing organization under procedures which afford an opportunity for diverse views to be considered and substantial agreement to be reached. 29 U.S.C. § 652(9).

6. Since the promulgation of the power-press guidelines, ANSI has developed safety standards for press brakes. These were published by ANSI in 1973, but they have not been promulgated under OSHA. Petitioners argue that ANSI would not have produced these separate guidelines except on the assumption that press brakes are not covered under existing OSHA regulations.

We find this reading of ANSI's motives unpersuasive; ANSI may have felt simply that it would be desirable to have more detailed standards for press brakes than are supplied in 29 C.F.R. § 1910.212. In any event, since § 1910.-212 is derived from the Walsh-Healey standard rather than from ANSI, ANSI's interpretation of that section is not entitled to weight. See generally *National Roofing Contractors Ass'n v. Brennan,* 495 F.2d 1294, 1298 (7th Cir. 1974), cert. denied, 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d 801 (1975).

ployers without fair notice. See, e. g., *Diamond Roofing Co. v. OSHRC*, 528 F.2d 645, 649 (5th Cir. 1976). Our task is to determine whether the agency's reading of the regulations is reasonable and whether the regulations are not unduly vague.

By its terms, 29 C.F.R. § 1910.212 clearly requires point-of-operation guarding on petitioners' press brakes. Subsection .212(a)(3)(ii) states flatly that "the point of operation of machines whose operation exposes an employee to injury shall be guarded." In addition, subsection .212(a)(3)(iv) informs employers that this guarding is usually required on power presses. There is substantial evidence to support the Commission's finding that the operation of Gem Top's and Irvington Moore's press brakes exposes their employees to serious injury; indeed, in Gem Top's case this fact was stipulated.

Citing 29 C.F.R. § 1910.5(c)(1), which provides that an applicable "particular standard" shall prevail over any "general standard" which might otherwise by applicable, petitioners urge that section .212 must give way before the more specialized provisions of § 1910.217. Section .217 details a number of different forms of point-of-operation guarding and requires that every power press be guarded by at least one of these methods. It also establishes other safety requirements for power presses.[7] Petitioners maintain that when .217(a)(5) provides that press brakes (and several other types of power presses) "are excluded from the requirements of this section," this means that no point-of-operation guarding is required on such machines.

We find petitioners' analysis unpersuasive. The rule that a specific standard prevails over a general standard can hardly

mean that a section from which press brakes are entirely excluded should preempt a section under which press brakes are clearly covered. Moreover, if the absence of standards for press brakes in the ANSI national consensus standard incorporated in § .217 were somehow to prevail over the standards for press brakes in the Walsh-Healey established federal standards incorporated in § .212, this would clearly ʼʼ ʼlate 29 U.S.C. § 655(a) which mandates application of the standard that assures the greatest protection for employees. Such a reading of the regulations would also do violence to the general canon of statutory construction that remedial statutes are to be liberally construed in favor of their beneficiaries, see *Phillips Inc. v. Walling*, 324 U.S. 490, 493, 65 S.Ct. 807, (1945); *American Smelting & Refining Co. v. OSHRC*, 501 F.2d 504, 511 (8th Cir. 1974); *Reliable Coal Corp. v. Morton*, 478 F.2d 257, 262 (4th Cir. 1973).

Petitioners' complaint that they were misled by the regulations into believing that no guards are required on press brakes is not credible in view of 29 U.S.C. § 654(a)(1), which, even in the absence of any regulations, requires every employer to protect his employees from "recognized hazards that . . . are likely to cause . . serious physical [injury]." See generally *American Smelting & Refining Co. v. OSHRC, supra.* Thus, we are convinced the most reasonable reading of the regulations is that .212(a)(3) applies to press brakes according to its terms because .217(a)(5) excludes press brakes from the coverage only of section .217 itself.[8]

Petitioners contend that if point-of-operation guarding was intended to be required on press brakes, it made no sense for them

---

**7.** Among .217's other requirements are pedal guards, regular inspections, age restrictions on operators, and reporting requirements.

**8.** Under 29 C.F.R. § 1910.217(a)(2), power presses installed prior to August 31, 1971 are temporarily exempt from the requirements of section .217. Although the Secretary contends that these machines must meanwhile meet the general requirements of section .212, the Commission has rejected his interpretation. See

*Diebold, Inc., supra* at 24,251. This creates an anomaly in that all press brakes, which are permanently exempt from .217, must immedi-.ately meet the .212 standards, whereas other power presses which are only temporarily exempt from .217 need not comply with .212. However, this minor inconsistency does not affect the reasonableness of applying .212 to press brakes.

to be excluded from .217, and thus that the regulations as interpreted by the Secretary are drafted illogically. Mere clumsiness in drafting, however, is not a ground for legal attack unless regulations are so poorly written as to be unconstitutionally vague. See *California Stevedore & Ballast Co. v. OSHRC, supra* at 988. Some awkwardness may be expected here simply because the guidelines are drawn from different sources. There is also considerable logic to the Secretary's reading of .212 and .217. Unlike section .217, which instructs the employer as to what safety devices he must install, section .212 is a "performance" standard which allows him more flexibility. Although the methods of guarding proposed by the government's expert witnesses in this case happen to be included in the options available under .217(c), the employer under .212 is not bound by this list. If the operation of the machine does not expose employees to injury, no guard is required under .212. Another difference between the sections is that .217 contains a number of additional requirements that are not in .212. Thus, for press brakes to be covered under .212 and not under .217 is not unreasonable, and taken together, the regulations are certainly not unconstitutionally vague.

The decisions of the Commission are affirmed.

ANDERSON, Circuit Judge, concurring:

I concur under the compulsion of the "deference rule" and Judge Lumbard's analysis of the applicability of 654(a)(1) and 655(a) of 29 U.S.C.

In so doing, it is my hope that we are not promoting "delay [of] the day when the occupational safety and health regulations will be written in clear and concise language so that employers [and others concerned] will be better able to understand and observe them." *Diamond Roofing v. OSHRC*, 528 F.2d 645, 650 (5th Cir. 1976).

WRIGHT, Circuit Judge, dissenting:

I respectfully dissent.

An employer is entitled to fair notice when dealing with the Government. An occupational safety and health standard must give an employer fair warning of the conduct which it prohibits or requires. *Diamond Roofing v. OSHRC*, 528 F.2d 645, 649 (5th Cir. 1976). The regulations in issue do not give this fair warning.

I believe that the employers could properly have assumed that the specific standards of 29 C.F.R. § 1910.217 controlled over the more general 29 C.F.R. § 1910.212. This is even more supportable when the differing opinions of the administrative law judges and commissioners below are considered.

A statute which is so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates due process. *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322. . . . This rule applies to regulations. See *Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 72 S.Ct. 329, 96 L.Ed. 367.

. . .

*Brennan v. OSHRC*, 505 F.2d 869, 872 (10th Cir. 1974).

The decisions of the Commission should be reversed.